**Rosemary SAPP, Plaintiff,**

v.

**CITY OF WARNER ROBINS, et al., Defendants.**

**Civ. A. No. 82–218–2–MAC.**

United States District Court,
M.D. Georgia,
Macon Division.

March 5, 1987.

Charles T. Erion, Macon, Ga., for plaintiff.

W. Warren Plowden, Jr., Macon, Ga., for defendants.

OWENS, Chief Judge:

Plaintiff, a former female employee of defendant City of Warner Robins' police department, brought this action pursuant to 42 U.S.C.A. § 2000e, *et seq.* and 42 U.S.C. § 1983, seeking declaratory and injunctive relief, and compensatory damages for the defendants' alleged discriminatory conduct. This matter was tried before the court without a jury on May 30, 1985. The court having considered the evidence

presented at trial and the arguments of the parties, now enters this memorandum opinion pursuant to Rule 52, Fed.R.Civ.P.

### Findings of Fact

1. The plaintiff, Rosemary Sapp, was hired in June of 1977 as a police officer with the Warner Robins Police Department. It was well known in the department that plaintiff was hired as a result of an employment discrimination suit against the City. (T. Vol. I, pp. 4, 52, and 92).

2. On January 5, 1978, the plaintiff was reprimanded in writing for violating police dress code regulations.[1] This was in response to an incident which occurred on January 4, 1978. On that day, the plaintiff reported to recorders' court to testify, as a police officer, wearing a tight fitting sweater and blue jeans worn inside knee-high boots. The case was forced to be postponed because of this. (Defendants' Exhibit # 4, p. 49).

3. In 1979, the plaintiff suffered an ankle injury and subsequently voluntarily resigned from the police force due to her injury. Later that same year, the police chief, Billy Hunter, asked the plaintiff to return to work. Plaintiff agreed to do so. However, plaintiff had been medically declared 15% disabled and was assigned to non-patrol light duties. (T. Vol. I., pp. 34, 50–53, 92–93).

4. In March of 1980, the plaintiff requested to be considered for the advertised position of sergeant. Placement into this position was considered a move up in rank and entailed higher pay. The plaintiff was told that she could not be considered due to her 15% disability. Plaintiff then had herself examined by a doctor and declared fully able to take on patrol duties. Plaintiff was then told that she could attend the assessment center conducted to screen the thirteen applicants for the position. The assessment was conducted by six personnel from outside the police department. (T. Vol. I., pp. 15, 99–100; Defendants' Exhibit # 4, p. 131).

5. The candidates were all put through five exercises in the promotion assessment. These exercises were used to measure the following: organization and planning, interpersonal relations, observational skill, leadership, oral communication, written communication, decision making, and behavioral flexibility. The candidates were scored on each exercise on a scale of "1" to "5" by each grader. At the conclusion of the testing period the graders pooled their scores and arrived at an overall rating for each candidate. Depending on the numerical grade given, each candidate was rated either "more than acceptable", "acceptable", "less than acceptable", or "not acceptable." The rating received was valid for one year. (Plaintiff's Exhibit # 2).

6. On April 30, 1980, the plaintiff was informed by Ms. Cathy Silengo, the Personnel Director for the City of Warner Robins, that she had not received a sufficiently high enough score in the assessment center to be further considered for the sergeant's position. Plaintiff was rated number eight out of the thirteen applicants and received a score of "less than acceptable." Plaintiff

---

1. These regulations provided:

COURT PROCEDURE
FORWARD
(SEC. 5) The primary purpose of a police investigation is the identification and apprehension of persons suspected of violating the various laws of the state and the community. The purpose of apprehension is to enable a court of proper jurisdiction to evaluate the circumstances of the offense to determine whether or not the individual on trial did in fact commit the offense as charged.
 Testifying in court is a major part of a police officer's job for two reasons:
 1. The presentation of evidence in a court of law marks the final step taken by the police in a given case.

 2. The quality and quantity of evidence as well as the effectiveness of its presentation serve as a major test of the completeness of the investigative efforts of the police.
PERSONAL APPEARANCE
(SEC. 5–1) Whether in uniform or civilian clothes, officers testifying in court should present a neat, business-like, and professional appearance. When not in uniform, officers shall wear a jacket, dress shirt, and tie in all courts, (including Recorders' Court). The basic nature of testimony is not altered by outward appearance, however, the weight which is given to that testimony by the jury may be greater or lesser depending upon an officer's physical appearance.
(Defendants' Exhibit # 24).

was, in all other respects, fully qualified. (T. Vol. I, pp. 6–8; Plaintiff's Exhibit # 1; and Defendants' Exhibit # 2).

7. In April, 1980, Chief Hunter interviewed all candidates deemed to have passed the assessment center. Chief Hunter evaluated each candidate in the following areas in addition to the assessment center score: job knowledge and performance, attendance, punctuality, prior disciplinary actions, commendations, education and training, and affirmative action goals. In this same month, Chief Hunter selected the top listed candidate in the assessment for the sergeant's position. This candidate was a male. There were no further sergeant promotions in the next twelve months. (T. Vol. I., pp. 11, 62, 64–65, and 75; Plaintiff's Exhibit # 2).

8. None of plaintiff's immediate supervisors were involved in the assessment center testing or in the decision process of who would be interviewed by Chief Hunter.

9. On May 5, 1980, the plaintiff protested the finding that she had failed the assessment center. Plaintiff requested that Ms. Silengo send to her the following relevant information: the plaintiff's numerical rating in the assessment, each individual assessors rating of plaintiff, written regulations on conduct of the assessment, and the criteria looked at in addition to the assessment center scores. All this information was provided to plaintiff, with the exception of individual assessors' scores. (Defendants' Exhibit # 4, pp. 134, 151).

10. On June 19, 1980, the City made the decision to accept assessment center scores of "less than acceptable" as a passing score for sergeant's promotions. Plaintiff was given this information for future sergeant promotion possibilities. (Plaintiff's Exhibit # 2, pp. 100–101).

11. In July or August of 1980, the plaintiff learned that the position of "Community Relations and Administrative Officer" was going to come open. This was a captain's position and was not an advertised job opening. The position was then currently held by Captain Tommy Batchelor. Upon hearing about the job opening, the plaintiff sought out Chief Hunter and informed him that she was interested in the position. Chief Hunter assured plaintiff that he would consider her request. (T. Vol. I, p. 38; Plaintiff's deposition, pp. 22–23).

12. On September 5, 1980, Captain Batchelor transferred from the above-described position to the position of patrol Captain. This old position was then simply made "Community Relations" and authorized to be filled by a sergeant due to the lessening of duties. Sergeant Hurley Batts, who had been a sergeant since February of 1979, was transferred into the new position. (T. Vol. I., p. 38; Plaintiff's deposition, pp. 22–23).

13. In September of 1980, the plaintiff signed up to be considered for two openings in the police department's detective division. Plaintiff was fully qualified for this position. (Defendants' Exhibit # 3).

14. Chief Hunter established a Board of Review to screen by personal interview the thirteen applicants for the two positions. This Board consisted of Major T.S. Wright, Chief of Detectives; Lt. Joel Sullivan, Detective; and Assistant Chief Edward Smith. In addition to the personal interview responses to standardized questions, the following were also considered: time with the department, performance evaluations, attendance record, disciplinary record, education, attitude, and appearance. After all candidates were interviewed, the Board submitted the names of the top four candidates to Chief Hunter. Plaintiff was not among the top four. Chief Hunter then made the final selection. Two males were selected to the positions by the Chief. (T. Vol. I., pp. 73–74, 101–102; Defendants' Exhibit # 3).

15. While on patrol-type duties, the plaintiff requested permission to go to her home outside the city limits, to eat lunch. This request was refused on the basis that she lived too far outside the city limits. Other individuals were allowed to go outside the city limits for lunch because they lived very close to the boundary.

16. On one occasion, the plaintiff was asked by Captain Gary Frost to accompany

him to Florida on a fishing trip. The plaintiff declined the invitation. The plaintiff also complained to Chief Hunter on numerous occasions alleging that Captain Frost was sexually harassing her. She also complained that Major Tommy Batchelor was sexually harassing her. The Chief promptly investigated every complaint that warranted it. Each time he found no evidence to support her claims.

17. Major Batchelor did not ask the plaintiff out nor direct comments of a sexual nature toward her. Captain Frost, other than asking the plaintiff out, did not direct comments of a sexual nature toward the plaintiff. The plaintiff was not accosted about the filing of her original Title VII suit.

18. In March of 1981, the plaintiff was assigned to traffic-type duties. While sitting at an intersection observing traffic from her squad car, the plaintiff observed a vehicle go through the intersection at an excessive rate of speed. After pulling the driver over, the plaintiff proceeded to give him a ticket. The driver, however, stated that he was in a hurry and to give the ticket to Major Batchelor, who would supposedly take care of it. The plaintiff stated that she would do this. Later that day, the plaintiff eventually got in touch with Major Batchelor on her police radio and told him that she had issued a citation to a friend of his, and the friend wanted him to take care of it. The plaintiff was also requested to bring the citation and ticket to the Major. The Major then ordered the plaintiff to come to the station house immediately. (T. Vol. I, pp. 102–104; Vol. II, pp. 101–102).

19. At the station house, Major Batchelor verbally reprimanded the plaintiff for insinuating that he would fix the ticket over the radio. There is evidence that the discussion was heated; however, the Major did not touch the plaintiff or knock a ticket book out of her hands. The Major also told the plaintiff that he was not afraid of any possible threat on her part of a lawsuit. The plaintiff then asked to go home, but the request was refused and she was or-

dered to return to her duties. (T. Vol. I., pp. 107–108; Vol. II, pp. 103–105).

20. That night, the plaintiff was admitted to the Houston County Hospital psychiatric ward, after she consulted with Dr. Paul Coplin, a psychiatrist. She remained there for about two weeks. For the next two months the plaintiff remained out from work, on sick leave, under the care of Dr. Coplin. (T. Vol. I., pp. 109–110).

21. On April 17, 1981, the plaintiff filed a charge of discrimination against the City of Warner Robins with the EEOC. The filing of this charge was well known in the City of Warner Robins' Police Department. (Plaintiff's Exhibit # 9).

22. On May 19, 1981, when plaintiff had used up all her sick and annual leave, Chief Hunter put plaintiff on leave without pay. On May 20, 1981, Chief Hunter informed the plaintiff that she had used up all her sick and annual leave. Further, he requested that she send a physician's statement on her status with regards to ability to return to work. On May 26, 1981, the plaintiff supplied Chief Hunter with a letter from Dr. Coplin which stated:

> Mrs. Sapp has been unable to work from March 10, 1981, to the present time due to medical impairment. I do not feel that she should return to work at the present time.

(Defendants' Exhibit # 4, pp. 162–165).

23. On May 27, 1981, the plaintiff requested that she be granted thirty days of advanced sick leave. Chief Hunter denied this request because he did not know the exact seriousness of plaintiff's illness, and thus did not know if plaintiff would even be returning to work to repay the advanced leave pay. Further, Ms. Silengo advised that even if plaintiff returned to work, it would take at least three years to pay the advance back. However, the plaintiff was advised that she could contact other officers to donate holidays or work time to her. (Defendants' Exhibit # 4, pp. 166–173).

24. Plaintiff requested a Captain Collins to post the request on the bulletin board at the station. Captain Collins, however, told plaintiff that Chief Hunter must be contacted by her and Hunter would post the

request. Plaintiff never contacted Chief Hunter to make the request.

25. On July 8, 1981, Chief Hunter wrote the plaintiff and informed her that she must submit a formal request and full medical documentation, to include discussions of medical problems and probable time of return to work, from her doctor to remain on leave without pay. When no response was received from the plaintiff, Chief Hunter then terminated plaintiff from employment on the police force. On July 27, 1981, the plaintiff was informed that the termination would be held in abeyance for a reasonable time to allow plaintiff to submit the requested material. On July 27, 1981, the plaintiff's attorney submitted to defendants' attorney a copy of two letters, dated July 2 and May 21 of 1981, written by Dr. Coplin to a different attorney representing plaintiff in a worker's compensation matter, that discussed plaintiff's medical condition. The letters contained no mention of plaintiff's probable time to return to work. One of the letters was a list of answers to questions that were sent to the doctor by plaintiff's worker's compensation attorney. However, the letter containing the questions was not sent to defendants. Defendants' attorney requested this letter, but it was never forwarded by plaintiff or her attorney. (Defendants' Exhibit # 4, pp. 174–182).

26. On October 20, 1981, Chief Hunter dismissed the plaintiff from the Warner Robins police force. (T. Vol. I., pp. 71–72; Defendants' Exhibit # 4, p. 188–190).

27. On October 22, 1981, Ms. Silengo made a memo to the personnel file of plaintiff, to the effect that defendants' attorney told her to terminate plaintiff because she had settled the worker's compenstion case and agreed not to seek re-employment. (Defendants' Exhibit # 4, p. 187).

28. On October 30, 1981, the plaintiff contacted Ms. Silengo and informed her that plaintiff's doctor had released her and that plaintiff was ready to return to work. On November 2, 1981, Ms. Silengo notified plaintiff to turn in her badge and equipment. On November 9, 1981, the plaintiff

wrote Ms. Silengo to again request a date to start work. She attached a letter from Dr. Coplin who stated that plaintiff was now able to work. A short time after this, Ms. Silengo was informed that the worker's compensation settlement was never finalized. On November 12, 1981, the defendants' attorney wrote plaintiff's attorney and stated that the official reason for plaintiff's discharge was failure to formally request leave of absence without pay, provide medical evaluations to support her absence, and provide a probable date of return to work. (T. Vol. I, pp. 16–20, 32–33; Defendants' Exhibit # 4, p. 198; Plaintiff's Exhibit # 5, 7 and 8).

*Conclusions of Law*

I. Title VII

A. *Sexual Harassment at the Workplace*

Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972,[2] prohibits sex discrimination in employment. Although the language of Title VII does not specifically address whether sexual harassment alone constitutes a cause of action, without a showing of tangible job detriment, it is now well settled that Title VII prohibits such conduct. *See Meritor Savings Bank v. Vinson,* — U.S. —, —, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 59 (1986).

Plaintiff contends that she was subject to just such unwelcomed sexual harassment during her employment with the Warner Robins Police Department. In *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir. 1982), the Eleventh Circuit specifically adopted the rule that a sexual harassment claim under Title VII can be asserted without a showing of economic detriment (*non quid pro quo* harassment). The court stated:

Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is

---

**2.** 42 U.S.C.A. § 2000e, *et seq.* (West 1981).

to racial equality. Surely a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets. A pattern of sexual harassment inflicted upon an employee because of her sex is a pattern of behavior that inflicts disparate treatment upon a member of one sex with respect to terms, conditions, or privileges of employment. There is no requirement that an employee subjected to such disparate treatment prove in addition that she has suffered tangible job detriment.

*Id.* at 902 (footnote omitted).

 The plaintiff must prove a number of elements to establish a Title VII sexual harassment claim. These elements are: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcomed sexual harassment; (3) the harassment was based on sex; and, (4) the harassment affected a "term, condition, or privilege" of employment. *Id.* at 903–905. Finally, if the harassment is alleged to have been conducted by a co-worker or supervisor, the plaintiff must prove respondeat superior. *Id.* The court will now discuss each of these elements.

1. *Does the plaintiff belong to a protected class?*

This element is easily met, since it only requires a showing that plaintiff is a man or a woman. *Id.* at 903.

2. *Was the plaintiff subject to unwelcomed sexual harassment?*

The plaintiff bases her harassment claim on the following grounds:

(1) Frequent unsolicited sexual remarks from supervisors or co-workers;

(2) Unwelcomed sexual propositions from Major Thomas Batchelor and Captain Gary Frost on different occasions; and,

(3) Frequent unsolicited remarks from supervisors or co-workers concerning plaintiff's original Title VII suit that led to her employment on the police force. 29 C.F.R. § 1604.11(a)(1986) provides that examples of harassment based on sex includes "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature...." Arguably, all of plaintiff's grounds come under this definition. However, the court has found as a factual matter, that remarks of a sexual nature were not made in the plaintiff's presence. Further, Major Batchelor did not proposition the plaintiff at anytime. Finally, no one ever mentioned plaintiff's original Title VII suit to her.

3. *Was the harassment complained of based upon sex?*

The totality of the testimony indicated that Captain Frost's motive in asking the plaintiff to go to Florida with him was to gain sexual favors. It is thus clear that but for plaintiff's sex she would not have been the object of this alleged harassment. *See id.* at 904.

4. *Did the harassment affect a "term, condition, or privilege" of employment?*

Psychological well-being is a term, condition, or privilege of employment pursuant to Title VII. *Id.* However, for the acts to constitute harassment under Title VII, they "must be sufficiently *persuasive* so as to alter the conditions of employment and create an abusive working environment." *Id.* (emphasis added). *See also Walker v. Ford Motor Co.,* 684 F.2d 1355, 1359 (11th Cir.1982). This court finds that Captain Frost's single effort to get the plaintiff to go out with him was not of a repeated or continuous nature to be sufficiently persuasive enough to affect plaintiff's psychological well-being.

5. *Respondeat Superior*

When, as in the case at bar, a plaintiff wants to hold the employer responsible for harassment created by supervisors or co-employees, the plaintiff must prove that the employer knew or should have known of the harassment and failed to take timely remedial action. *Henson,* 682 F.2d at 905. The totality of the testimony plainly indi-

cates that plaintiff did, at numerous times, complain to Chief Hunter about alleged harassment. The testimony further shows, however, that Chief Hunter, in good faith, took prompt action to investigate the allegations. Each time, lack of evidence led the Chief to conclude that harassment had not occurred.

Accordingly, plaintiff could not hold the City of Warner Robins liable even if persuasive harassment had occurred; which this court has already determined did not happen.

Therefore, the plaintiff has not proven her Title VII claim of *non quid pro quo* sexual harassment.

## B. *Denial of Promotions*

■ Plaintiff alleges that she was not promoted nor considered for promotion because of her sex. Failure to promote because of sex is a Title VII disparate treatment cause of action. In disparate treatment cases, proof of defendant's discriminatory motive is required. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Maddox v. Claytor*, 764 F.2d 1539, 1546 (11th Cir. 1985). Discriminatory motive can be proven by circumstantial or direct evidence. *See Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1141–43 (11th Cir.1983).

The Supreme Court of the United States has developed a burden-shifting analysis that should be used when a discriminatory motive is to be inferred from circumstantial evidence.[3] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). First, the plaintiff must establish a prima facie case of discrimination. 411 U.S. at 802, 93 S.Ct. at 1824. If plaintiff meets this hurdle, the burden of production shifts to the employer to "articulate some legitimate, non-discriminatiory reason" for the alleged

discrimination. *Id.* If the employer fails to meet this burden, the plaintiff's prima facie case is unrebutted and judgment must be entered for the plaintiff. 450 U.S. at 254, 101 S.Ct. at 1094. If the employer, however, rebuts the plaintiff's prima facie case, the plaintiff must prove by a preponderance of the evidence that a discriminatory intent motivated the employer's action. 411 U.S. at 804, 93 S.Ct. at 1825. If plaintiff carries this burden, the employer may rebut the presumption of discrimination by showing that the action would have been taken even in the absence of discriminatory intent. *Perryman*, 698 F.2d at 1142. *See also Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

### 1. *Plaintiff's Prima Facie Case*

The plaintiff can establish a prima facie case of promotion discrimination by proving that she is a member of a protected group, applied and was qualified for the promotion in question, was rejected, and another employee with equal or lesser qualifications who was not a member of the protected group was promoted. *Perryman*, 698 F.2d at 1142 n. 7.

■ The plaintiff contends that she was discriminated against for not being promoted into the following positions: detective, sergeant, and Community Relations and Administrative Officer. The court finds that plaintiff has proven a prima facie case concerning the positions of detective and sergeant. The plaintiff has not proven a prima facie case of discrimination in relation to the Community Relations position. First, the plaintiff was not qualified by rank to fill the position. When plaintiff first approached Chief Hunter about the position, it was a captain's slot. The plaintiff was just a patrolman. When that position was changed and made a sergeant's position, the plaintiff was still not qualified to fill it because of her rank. Finally, the filling of the position was a transfer and not a "promotion." The original position

---

**3.** This same analysis is also used in § 1983 race discrimination suits. *See Lee v. Russell County*

*Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir.1982).

was down graded by responsibility and rank. The new position required a sergeant and was filled by one with much experience. There was no raise in pay or increase in responsibility for this person. This was nothing more than a transfer from one sergeant's position to another.

### 2. Defendants' Burden of Production to Rebut Plaintiff's Prima Facie Case

When plaintiff established a prima facie case of discrimination, the burden shifted to defendants to produce a legitimate, non-discriminatory reason for not promoting the plaintiff to detective or sergeant. This court has kept in mind that defendants' burden of rebuttal is a light one. The defendants' burden is one of production and not proof. *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir.1982). "[T]he defendant need not persuade the court that it was actually motivated by the proffered reasons ... it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 2194. The defendants' have met this burden.

Concerning the two detective positions, the plaintiff was given a personal interview by a three-person panel meant to screen all thirteen candidates. Each candidate was asked approximately twenty-two standard questions. Each candidate was also evaluated on education, attendance, disciplinary record, attitude, and appearance. The panel picked the top four candidates and submitted the names of these individuals to Chief Hunter for final selection. Plaintiff was not among the individuals selected to interview with the Chief. Clearly, this evidence indicates that a question of fact is presented that the panel found the plaintiff to not be among the best four qualified individuals of the entire candidate pool. Selection of the top individuals is a legitimate non-discriminatory reason why the plaintiff was not selected. Defendants have met their burden of production to rebut plaintiff's prima facie case in the detective promotion.

All candidates for sergeant were screened by the assessment center, conducted by individuals from outside the department. Each candidate was evaluated in a number of standardized areas and given a numerical score by each of the six graders. These scores were added up for an overall rating. Plaintiff's numerical rating given by the graders was not a passing score at the time she completed the test. Thus, she was not interviewed by Chief Hunter to be further considered for the single sergeant's position available. Again, the process evidences a legitimate screening procedure. Since the plaintiff did not pass the assessment center pursuant to the cut-off scores then in force, the defendants have shown that a non-discriminatory reason existed for why plaintiff was not promoted.

### 3. Pretext

The plaintiff must now show by a preponderance of the evidence that the defendants' explanation is pretextual. 411 U.S. at 804, 93 S.Ct. at 1825. The plaintiff has failed to produce any evidence to indicate this. Both Major Batchelor and Captain Frost, the individuals that plaintiff alleges harassed her, were not involved in any manner whatsoever in the selection process for the detective and sergeant positions. The plaintiff neither alleges nor has produced circumstantial evidence that the other individuals involved acted in a discriminatory manner toward her. The plaintiff has failed to rebut defendants' articulated legitimate reasons for not promoting her.[4]

### C. Retaliation

The plaintiff also contends that she was retaliated against on account of her previously having filed a sex discrimination suit against the City of Warner Robins in 1976, and that this retaliation manifested itself in

---

4. The court is aware that the *McDonnell Douglas* test is inappropriate when direct evidence of discrimination exists. *See Lee*, 684 F.2d at 744. However, the court has found no such evidence in the case at bar.

unequal treatment and eventual wrongful discharge.

### 1. *Denial of Privileges and Benefits of Employment*

Plaintiff alleges that she was retaliated against by being denied opportunities or privileges given to male officers. First, plaintiff contends that she was not allowed to eat lunch at her home outside the city limits, when male officers were allowed to do so. Next, she was reprimanded for wearing civilian attire. in a court proceeding, when police policy permitted it. Finally, plaintiff asserts that she was denied the privilege of having a letter posted on the bulletin board at work, when male workers were allowed to do so, for the purpose of requesting other employees to fill in for her when she had exhausted her sick leave.

Title VII protects employees against retaliation by an employer for participation in an employment discrimination suit. *See* 42 U.S.C.A. § 2000e–3(a) (West 1981). Proof of retaliation is governed by the same basic analysis as used in the court's discussion of promotional discrimination. The plaintiff must first present prima facie proof of retaliation. The employer must then rebut the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its actions. If defendant can do this, then the court must consider whether the stated reason is pretext. *See Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 600–01 (11th Cir.1986).

■ To establish a prima facie case of retaliation the plaintiff must show: (1) that she was engaged in a statutorily protected activity; (2) that the employer has taken an adverse employment action; and, (3) a causal connection exists between the two. *See Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.1985).

■ The plaintiff has not shown a prima facie case on the claim that she was denied equal access to the bulletin board to post her request for fellow workers to fill in for her. No adverse action was taken on plain-tiff's request. By her own testimony, the plaintiff showed that she requested Captain Collins to formulate and post the request. Captain Collins told her, however, that she would need to talk to Chief Hunter since the request would be written and signed by the Chief.[5] None of the testimony at trial supports a finding that plaintiff ever asked Chief Hunter to post the request. Plaintiff testified in her own deposition that she could not remember if she did or not. No other testimony evidences that she did. Plaintiff has not shown a prima facie case on this ground.

■ Assuming, without deciding, that plaintiff has made out a prima facie case on the remaining two grounds, the defendants have articulated legitimate, non-discriminatory reasons for the actions taken. Concerning the disallowance of plaintiff's request to go outside the city limits to her home for lunch, the totality of the evidence indicates that some officers, to include females, were allowed to do so. However, the evidence shows that these individuals were allowed to do so only because they lived in very close proximity to the city limits. The court finds that the rejection of plaintiff's request was based upon the legitimate, non-discriminatory decision that plaintiff lived too far outside the city limits.

The plaintiff's assertion that civilian attire is allowed to be worn by a Warner Robins police officer while in court is entirely correct. However, according to police policy, an officer "should present a neat, business-like, and professional appearance" when testifying in court. The reprimand that plaintiff received was based upon a judgment that she did not present such an appearance when she appeared in recorders' court on January 4, 1978. The testimony about what plaintiff wore to court on that particular day supports this court's conclusion that the remprimand was based on legitimate, non-discriminatory reasons.

Now the court must determine if the defendants' proffered reasons were merely pretext. This court concludes that the

---

**5.** Indeed, the plaintiff testified in her deposition that the normal posted request did have Chief Hunter's approval on it to encourage others to help out.

plaintiff has not proven by a preponderance of the evidence that defendants' articulated reasons were not the sole causes of the decisions made. *See Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1500 (11th Cir.1985). Accordingly, plaintiff's retaliatory claims based on denial of rights and privileges of employment must fail.

### 2. *Retaliatory Discharge*

 The plaintiff also alleges that she was discharged in retaliation for her filing of the original employment discrimination suit before she was employed with the Warner Robins police force and the subsequent EEOC complant she filed while employed with the department. The test to be utilized in a retaliatory discharge case is the same as the court used in the above retaliation discussion. *See, Simmons*, 757 F.2d at 1187. There is no doubt that plaintiff has proven a prima facie case of retaliatory discharge. However, the defendants have produced a legitimate, non-discriminatory reason why plaintiff was discharged.

The defendants assert that plaintiff was discharged because she did not file a properly supported request for a leave of absence. Specifically, the plaintiff did not file an up-to-date letter from her physician stating what plaintiff's medical problems were and when plaintiff could possibly return to work. The court concludes that based upon its findings of fact, this is a legitimate, non-discriminatory reason for the discharge of plaintiff.

The plaintiff, of course, contends that this was mere pretext. She bases this assertion on the fact that contradictory reasons for plaintiff's discharge were given. The evidence shows that, indeed, there was confusion as to exactly why the plaintiff was being discharged. Cathy Silengo thought plaintiff had opted not to return to work as part of a worker's compensation settlement. Chief Hunter testified that he could not remember exactly why the plaintiff was discharged. However, the dismissal report that the Chief filled out on October 20, 1981, concerning the plaintiff, had attached to it the July 20, 1981, letter of termination of plaintiff for failure to sub-

mit proper medical verification. The Chief acknowledged that the letter, if attached, would have been his reason for discharging the plaintiff. The final letter from defendants' attorney to plaintiff's attorney stated that the City of Warner Robins' official reason for plaintiff's discharge was that she did not file the proper medical paperwork to stay on leave of absence without pay.

This court finds that the reasoning submitted by the defendants was not merely pretext. The totality of the evidence indicates that the contradiction was simply due to miscommunication between the City of Warner Robins' personnel office, Chief Hunter's office, and the defendants' attorney. Therefore, the plaintiff has not proven a retaliatory discharge claim against the defendants.

Accordingly, judgment will be entered for the defendants and against the plaintiff on all of plaintiff's claims.