**Linda SILVERSTEIN, Plaintiff,**

**v.**

**METROPLEX COMMUNICATIONS, INC. etc., Defendant.**

**No. 85–1099–CIV–MARCUS.**

United States District Court, S.D. Florida.

Jan. 12, 1988.

Stuart A. Goldstein, Miami, Fla., for plaintiff.

Marcy M. Hallock, Mindy A. Lieberman, Baltimore, Md., for defendant.

## FINAL ORDER, FINDINGS OF FACT, CONCLUSIONS OF LAW

MARCUS, District Judge.

THIS ACTION was brought by Plaintiff Linda Silverstein, a woman formerly employed by radio station WHYI ("Y–100"), alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* At the heart of this Complaint are two claims: (1) that Defendant corporation, through its agents and employees, sexually harassed the Plaintiff, creating an intimidating and oppressive work environment; and (2) that Defendant wrongfully terminated Plaintiff because of sex discrimination. Ms. Silverstein's Complaint was tried before the Court without a jury, and pursuant to Rule 52(a), Federal Rules of Civil Procedure, we make the following Findings of Fact and Conclusions of Law.

### I. *Findings of Fact*

1. The Plaintiff, Linda Silverstein, a resident of Dade County, Florida, at all times relevant, was employed by Defendant Metroplex Communications, Inc. ("Metroplex") from September 1979 until November 16, 1981, when she was terminated by Defendant.

2. Defendant, Metroplex Communications, Inc., is a Florida corporation, with offices in Hollywood, Broward County, Florida. At all time relevant to this lawsuit, Metroplex owned and operated two radio stations in the South Florida area, WHYI–FM, and WHTT–AM. The forerunner of Metroplex station WHTT–AM was station WWOK Radio.

3. Plaintiff commenced her employment with Metroplex when she was hired as an account executive (salesperson) for WWOK in September 1979. In or about December 1980, Plaintiff was promoted by Metroplex to the position of National Sales Manager for Y–100, a position she held until her termination in November 1981.

4. Y–100 is a popular "top 40" FM radio station located in Hollywood, Florida, and it features current rock-and-roll hits. It employs about thirty-five full time employees. Y–100 is very different in nature and size from WHTT–AM. The sales market at Y–100 is substantially larger than at WHTT. An FM mass market station, Y–100 is rated number one in the relevant market. WHTT, on the other hand, is an AM specialty format station with a diminished market share. The national sales goal in 1981 for Y–100 was $1,600,000; for WHTT, the goal that year was only $200,000. The forerunner station WWOK, originally had a "country format"; when it became WHTT, it changed to an Hispanic-oriented format.

5. In September 1980, the position of National Sales Manager became vacant at Y–100 when Deborah McLaughlin resigned from that position in order to accept a lucrative offer with a large Group W station in Philadelphia.

6. The position of National Sales Manager at Y–100 involved substantially greater responsibility than that of an account executive at WHTT. Among other things, the position of National Sales Manager included responsibility for coordinating all national sales, maintaining telephone contact with the various offices of McGavren Guild, Y–100's exclusive national sales representative, and generating growth in national sales.

7. When the position of National Sales Manager became vacant, Plaintiff actively pursued that opening, submitting a detailed resume to the Defendant's General Manager Matthew Mills which summarized her qualifications. Mills, who reported to Defendant's Group Vice President David Ross, interviewed Plaintiff several time for the vacant position. In the course of these interviews, Mills increased the financial consideration of the job. At first, Mills offered to pay Plaintiff a total of approximately $21,000 per year, composed of a base salary of some $12,000, and commission based upon sales. The Plaintiff rejected the offer, opining that she could not support herself on that salary. Mills final-

ly agreed to pay her more money and changed the formula of the salary, offering the Plaintiff a base salary of $18,000, and a commission that would enable Plaintiff to earn up to $25,000 per year. Plaintiff then accepted the position as Y–100 National Sales Manager, which was a clear promotion from her previous sales position with a smaller local AM radio station. Indeed, as local salesperson, Plaintiff's compensation in 1980 totaled some $18,000; as National Sales Manager, her 1981 total salary was some $22,000 for an eleven-month period. Moreover, the supervisory responsibility associated with the new position was substantially greater than the previous position. Although Plaintiff has claimed that she was "coerced" by Mills to accept the new position, the facts presented do not support that claim. As we have noted, she actively solicited the new and expanded position at a much larger radio station, and this involved a substantial career opportunity. The position had proven to be a springboard for substantial career advancement for the Plaintiff's predecessor, Deborah McLaughlin.

8. Plaintiff has also claimed that she was paid less and received fewer job-related benefits as Y–100 National Sales Manager than George Fittere, who was National Sales Manager of the AM station, WHTT. The testimony presented at trial, however, established that the two positions were not comparable. The two stations were very different and the job responsibilities differed, too. Moreover, Fittere's base salary and commissions amounted to a lower compensation than Plaintiff's. Plaintiff has also argued that since Fittere had access to a company car and she did not, that she was the victim of discrimination on account of sex. The facts suggest, however, that Fittere was not given a car when he took the position as part of his compensation, but rather was permitted to use a car which had been leased by the company for the use of another corporate official who had resigned. The lease had not expired and Fittere was permitted to use the company car. The facts also suggest that Fittere needed the car because his job responsibilities included setting up and dis-

mantling merchandise and product displays at various grocery stores. By contrast, Plaintiff's duties as Y–100 National Sales Manager evidenced little need for a company car. She bore no responsibility for the local display of products at various grocery store outlets. Finally, Plaintiff has pointed to the nature and physical location of her office as further evidence of discriminatory animus. The Plaintiff used an available conference room when she assumed her new duties because no private office was then available. David Ross testified that she was subsequently offered a private office, but Plaintiff chose to remain in the conference room, which by her own admission was large.

9. At the heart of Plaintiff's Complaint is the claim that she was wrongfully terminated as Y–100 National Sales Manager in November 1981, just eleven months after taking the job, as a result of Defendant's gender-based bias. Plaintiff has argued that her job performance was satisfactory throughout 1981, and that she was sexually harassed by the Defendant's employees and agents until her wrongful termination.

The charges are serious and merit the most careful examination of the entire record. We have concluded, however, that the record evidence does not sustain Plaintiff's assertions, and, we find that Plaintiff was in fact terminated for lawful business reasons relating to her unsatisfactory performance as Y–100's National Sales Manager, and not as a result of gender-based bias.

10. At the outset, we observe that Plaintiff failed to attain Y–100's established sales goal for 1981, which was set at $1,600,000. Plaintiff was informed of that goal when she was selected as National Sales Manager in December 1980. In fact, Plaintiff fell some $200,000 short of that projection. By contrast, Plaintiff's predecessor, Ms. McLaughlin, substantially exceeded the sales goals from the outset. Further, David Ross testified that the station's basic market had experienced growth at the rate of 10 to 11 percent per annum for ten years, but that Plaintiff had only managed to increase sales at the rate of 5

to 7 percent per annum, a level amounting to "negative growth" in the market. Ross also stated that in 1982, after a company-based reorganization was effected, actual growth reached some 13 percent, and in 1983 it increased to approximately 19 percent. Mills also testified as to Plaintiff's inability to meet the stations's projected national sales goals. He further noted that Plaintiff turned down some sales business that representatives sought to place with the station notwithstanding the availability of air time.

The decision to terminate Plaintiff was made in the fall of 1981, at the urging of Ross, and only after it became apparent that 1981 sales would fall far short of the projected national sales goal.

11. A second serious job-related problem experienced by Plaintiff was her apparent inability to work successfully with representatives of McGavren Guild, Y-100's exclusive national sales representative firm. McGavren Guild is a well-regarded national sales representative firm which is in the business of representing radio stations throughout the country by securing national advertising in return for a sales commission. In essence, McGavren Guild sold commercial air-time for its client stations to various advertising agencies who purchased time for national advertisers.

Anthony Maisano, McGavren Guild's Executive Vice President for the Southern Region, testified at length and in detail about many problems which his agency experienced in working with the Plaintiff. Ms. Silverstein's job responsibilities included, perhaps most significantly, the coordination of McGavren Guild's activities, as it negotiated sales on behalf of Defendant. Maisano recounted that these problems included inaccessibility, the failure to return telephone calls, the failure to ensure that McGavren Guild was aware of inventory availability, and ineffectiveness in accommodating orders and turning business away. Maisano testified that these problems were serious and substantial, and required him to deal directly with Plaintiff's supervisor. The result was, he stated, lost business for Y-100 and lost sales commissions for McGavren Guild.

Maisano complained about Plaintiff's job performance to Plaintiff's superiors, including Mills, the Defendant's General Manager, and Ross, the Defendant's Group Vice President. Mills testified specifically that Plaintiff's unavailability was a real problem, and that Plaintiff did not return telephone calls. Mills counseled and warned Plaintiff about this problem in June 1981. He also told Plaintiff about the problems being experienced by Mr. Maisano and McGavren Guild's Atlanta office. Mills recounted that his superior, Ross, complained bitterly to him about Plaintiff's job performance, and expressed great concern that the company's relationship with McGavren Guild was being jeopardized.

Ross also testified that McGavren Guild, whom he characterized as the "Rolls Royce of the industry" repeatedly complained to him about Plaintiff's job performance. He added that the Defendant's relationship with McGavren Guild was a matter of great importance, and that McGavren Guild had not complained to him about anyone else. Ross characterized Plaintiff's job performance as falling substantially beneath Defendant's standards, not only because she had precipitated a serious deterioration in relations with McGavren Guild, but also because her sales were far short of the Defendant's national sales goal.

Norman Wain, one of the owners of Metroplex, testified that he too had learned of Plaintiff's inability to work successfully with McGavren Guild representatives, and, like Ross, he underscored the significant role played by McGavren Guild. He further testified that he concurred in the decision made by Ross and Mills to terminate Plaintiff both because he believed that the company's very relationship with McGavren Guild was at issue, and because the Plaintiff failed to meet well-established sales goals. This Court has found both Norman Wain and David Ross to be particularly credible witnesses, and we are satisfied that the decision to terminate Plaintiff was not a result of gender-based discrimi-

nation, but rather was the product of neutral business reasons, unrelated to gender.

12. Plaintiff has also alleged that she was sexually harassed by Matthew Mills, Norman Wain, Jeffrey Monda and Robert Davis, and that in the aggregate this behavior created an oppressive and intimidating work environment. We have found, however, that Plaintiff was not terminated as a result of gender-based discrimination. This finding substantially undercuts Plaintiff's corollary contention of sexual harassment. In addition to having found that Plaintiff was terminated for lawful business reasons, on this record we are not persuaded that the Defendant created a hostile work environment. Some of the incidents cited by Plaintiff do not amount to sexual harassment; as to others, we are not persuaded that Plaintiff has sustained her burden of persuasion.

13. First, the record does not support the claim that Mills evinced gender-based animus simply by inquiring about the well-being of Plaintiff's boyfriend. Second, it does not support Plaintiff's claim that Mills paid Plaintiff less than he would have paid a man as National Sales Manager, or that he treated Plaintiff in a disparate manner as a result of sex. Third, we are not convinced that Mills ever made a joke at a sales meeting about a vibrator in Plaintiff's presence. Nor, finally, has Plaintiff established Mills' purported bias simply because, on one occasion, while on a business trip, he may have asked Plaintiff to hold for him his newspaper or wallet.

14. We note, in passing, that Plaintiff did not complain to anyone at Metroplex about Mills' alleged harassment. While it is undoubtedly often true that a victim of sexual harassment will be extremely reluctant to complain about misconduct, within the context of this case, Plaintiff was able to criticize Mills' putative misconduct to David Ross or Norman Wain. Ross was fully accessible to his staff; he quite apparently encouraged communication with his staff; his office was next door to Plaintiff's office; and his integrity has been unquestioned throughout the proceeding. Moreover, Plaintiff did communicate with Mills' superiors as to a number of issues. Norman Wain was accessible as well to the Y–100 staff. He testified that he visited the Y–100 office about every six weeks, and Plaintiff had occasion to communicate with him.

15. Likewise, on this record, we are unpersuaded that Norman Wain was motivated in his dealings with Plaintiff by gender-based bias. In support of this claim, Plaintiff has only pointed at one incident—when Wain, while on a business trip to a resort where an annual sales meeting was being held, and in the course of social conversation about her life, asked Plaintiff if she was engaged, or married or pregnant. This singular comment, in this social context, cannot support the claim that Defendant created an oppressive work environment.

16. Jeffrey Monda, a Y–100 salesperson, flatly denied Plaintiff's contention that in October 1981 he told Plaintiff he had a sexual dream about the Plaintiff.

17. Robert Davis, a Y–100 salesperson, denied Plaintiff's claim that he called Plaintiff at her home and tried to convince her to spend the night with him at his apartment.

18. Plaintiff has also failed to persuade this Court that she was terminated by Mills because the Defendant had already succeeded in avoiding any potential problem relating to Defendant's EEO compliance with the Federal Communications Commission. Had Defendant hired Plaintiff solely to inflate the number of women it employed for statistical purposes, it could have terminated Plaintiff before November 1981. Beyond that, and more importantly, the evidence available to the Court established that Y–100 employed a sufficient number of women so that Plaintiff's termination would not have had any real effect for license renewal purposes. In 1981, according to the FCC guidelines, Defendant had to employ women at a 50% rate, based upon the percentage of women in the Broward County workforce. During the relevant period, women comprised 39% of the Broward County workforce. Therefore, 19.5% of Y–100's employees had to be fe-

male pursuant to FCC guidelines. Even without Plaintiff, the Defendant's workforce was more than 19% female. Moreover, the FCC guidelines were only guidelines, and not rigid arithmetic quotas. Perhaps still more basic is that we have found Plaintiff was terminated because her job-related performance was unsatisfactory. On this record, Plaintiff has not satisfied us either that Defendant created or maintained an oppressive work environment, or that she was terminated as a result of gender-based bias.

19. Finally, Defendant had also made the decision, prior to Plaintiff's termination, that the position of National Sales Manager would be extensively altered. Metroplex created a position of General Sales Manager which supervised both national and local sales. Plaintiff's "successor," David Harris, filled this new and expanded position. This positon required more work, and he was provided an assistant. Because of the changed nature of the position, we are unable to determine whether Harris was more qualified to perform Plaintiff's job. However, the evidence does not establish that Plaintiff was replaced because she was a woman or that her successor was selected because he was a man.

## II. Conclusions of Law

### A. Discriminatory Discharge

1. Plaintiff maintains that her discharge by Metroplex was based upon sex discrimination. Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), "[t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of ... discrimination." *Id.* at 802, 93 S.Ct. at 1824. Thereafter, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." [Then] should the defendant carry this burden, the plaintiff must ... have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (*citing McDonnell Douglas Corp.,* 411 U.S. at 802, 804, 93 S.Ct. at 1824, 1825).

■ A prima facie case of sex discrimination in the termination of an employee is established where

the plaintiff proves by a preponderance of the evidence that he or she is a member of a protected class, was qualified for the position held, and was discharged and replaced by a person outside of the protected class or was discharged while a person outside of the class with equal or lesser qualifications was retained.

*Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1142 (11th Cir.1983) (*quoting Lee v. Russell County Board of Education,* 684 F.2d 769, 773 (11th Cir.1982)). Here, we find that the Plaintiff has not met her initial burden and established a prima facie case of sex discrimination.

Obviously, Plaintiff has established that, as a woman, she is a member of a protected class. We find, however, that she has failed to establish the other necessary elements of a prima facie case even though we recognize that that burden is "not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The only evidence produced by the Plaintiff that tends to demonstrate her qualifications for the position of National Sales Manager at Y–100 is her background as an account executive for WWOK, as well as the station management's initial decision to hire her for the position. While these factors may point to the conclusion that she may have been qualified for the job, the Defendant's proof of her actual performance certainly indicates that she was not qualified for this position. As detailed at length, *supra,* Plaintiff failed to attain Y–100's established sales goals for 1981 and the sales actually experienced "negative growth" relative to the increase in the market. Further, Plaintiff was unable to effectively work with McGavren Guild, a national sales representative firm. A good working relationship between Y–100 and McGavren Guild was crucial to the development of national sales. Indeed,

David Ross testified that Plaintiff's job performance fell substantially beneath Defendant's standards. The facts satisfactorily indicate that the Plaintiff was not capable of performing the functions required as the National Sales Manager, and therefore was not qualified for the position. Finally, even assuming *arguendo* that Plaintiff had adduced evidence which established, by a preponderance of the evidence that her replacement, David Harris, had "equal or lesser qualifications,"—and this record supports no such finding—she still has failed to establish a *prima facie* case of discrimination. Accordingly, we conclude Plaintiff has not met her initial burden as to recovery under Title VII.

■ 2. The evidence submitted by the Defendant serves two purposes. First, it refutes evidence marshalled in support of the Plaintiff's prima facie case. Also, it affirmatively identifies the Defendant's actual reasons for the termination decision. Even assuming *arguendo* that the evidence submitted by the Plaintiff actually demonstrated that she was qualified for the position and that her termination occurred "under circumstances which give rise to an inference of unlawful discrimination," *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094 (footnote omitted), we would still conclude that the Plaintiff may not recover here. Metroplex has successfully rebutted any inference of discrimination by producing evidence, detailed at some length, *supra*, that the Plaintiff was terminated for "a legitimate, nondiscriminatory reason." *Id.* at 254, 101 S.Ct. at 1094. While "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons," *Id.* (citation omitted), it has.

3. Once a defendant has successfully rebutted the inference of discrimination, the Plaintiff, in order to prevail, must demonstrate that the reasons given by the defendant for the discharge were merely pretextual, "by persuading the court that a discriminatory reason more likely motivated the employer or ... by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095 (*citing McDonnell Douglas Corp.*,

411 U.S. at 804–05, 93 S.Ct. at 1825–26). Plaintiff has failed on both grounds. In support of her argument, Silverstein maintains that she was hired solely to inflate the number of women employed by Y–100 because of FCC requirements. We are unpersuaded, having found that the FCC regulations were not a factor in the termination decision. Moreover, this fact alone, particularly when viewed in light of the adverse evidence presented regarding Plaintiff's job performance does not, in any way, demonstrate that the termination decision was based on gender-bias, or render the Defendant's account incredible.

B. Sexual Harassment

4. It is now well established that Title VII prohibits sexual harassment in employment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *see also Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982); *Sapp v. City of Warner Robins*, 655 F.Supp. 1043 (M.D.Ga.1987).

In contrast to the disparate treatment cases brought under Title VII, "sexual harassment that creates an offensive environment does not present a factual question of intentional discrimination which is at all elusive." *Henson*, 682 F.2d at 905 n. 11. Accordingly, the Eleventh Circuit Court of Appeals has determined that the Plaintiff need establish the elements of this cause of action employing "normal principles of pleading and proof allocation." *Id*, The shifting burdens of proof and production, as mandated by *Burdine*, do not apply to this claim.

■ 5. In order to establish a sexual harassment claim, the Plaintiff must establish five elements.

These elements are: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcomed sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a "term, condition or privilege" of employment. Finally, if the harassment is alleged to have been conducted by a co-worker or supervisor, the plaintiff must prove respondeat superior.

*Sapp,* 655 F.Supp. at 1049 (*citing Henson,* 682 F.2d at 903–905). Plaintiff has failed to establish the existence of all of these elements.

■ 6. Again we must begin the analysis of this claim with the recognition that the plaintiff, as a woman, belongs to a protected group. The subsequent three prongs of the *Henson* test rest on the nature and extent of the purported harassment. In defining "sexual harassment," the Supreme Court in *Meritor Savings Bank, supra,* looked to federal regulations and earlier caselaw. "[C]onduct that may be actionable under Title VII ... include[s] '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.' " *Meritor Savings Bank,* 106 S.Ct. at 2405 (*quoting* 29 C.F.R. § 1604.11(a) (1985)). Moreover, "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.* at 2405–06 (*citing Henson, supra*). However, not all conduct which may be viewed as sexual harassment creates a basis for recovery under Title VII. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Id.* at 2406 (*quoting Henson,* 682 F.2d at 904).

■ The conduct complained of by Silverstein can be divided into the two types of harassment detailed by the Court in *Meritor Savings Bank.* The contentions that Robert Davis tried to convince Plaintiff to spend the night with him; that Mills made a joke about a vibrator; and that Monda told her that he had a sexual dream about her surely could be viewed as a "sexual advance," or "verbal conduct of a sexual nature." However, the Plaintiff has simply failed to convince us that the purported conversations with Davis and Monda ever took place or that Mills made the joke.

Plaintiff also cites instances where she was asked about her boyfriend, and whether she was engaged, married or pregnant. She also claims that she was paid less than a man would have been paid in the job, and that on one occasion Mills asked the Plaintiff to hold his wallet and newspaper. These claims must be viewed as purporting to establish that sex discrimination created a hostile work environment. On this record, Plaintiff has failed to convince this Court that the conduct detailed was anything other than common social interaction or that her compensation was diminished because of her sex. There was no evidence adduced which suggests that these instances were motivated by gender bias. "Whether sexual harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well being of employees is a question to be determined with regard to the totality of the circumstances." *Henson,* 682 F.2d at 904 (citations omitted); *cf., Moylan v. Maries County,* 792 F.2d 746, 749–50 (8th Cir.1986); *Del Valle Fontanez v. Aponte,* 660 F.Supp. 145, 149 (D.P.R.1987). In this case, the Plaintiff has not met her burden of proof.

Finally, "[w]here ... the plaintiff seeks to hold the employer responsible for the hostile environment created by plaintiff's supervisor or co-worker, she must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Henson,* 682 F.2d at 905 (citations and footnote omitted). Here, the alleged harassment was purportedly committed by Plaintiff's supervisors and co-workers. We have found, however, that Silverstein failed to complain to anyone at Metroplex about the harassment even though she had the opportunity to do so. Both Ross and Wain, as representatives of Metroplex, were available to hear Plaintiff's grievances. Also, the harassment was not so pervasive as to put Metroplex on constructive notice of the conduct. *Id.* Accordingly, Plaintiff has also failed to prove that the Defendant acquiesced to any sexual harassment. To the extent that the alleged harassment was purportedly committed by Metroplex employee Wain, Plaintiff would not be required to prove the respondeat superior element. However, given our finding as to

the harmlessness of his alleged conduct, liability does not attach.

Having found that the Plaintiff has failed to establish that her termination of employment at Y–100 was the result of gender-based discrimination, or that the Defendant created a hostile work environment through sexual harassment, it is hereby

ORDERED AND ADJUDGED that judgment is entered for the Defendant.