Susan REYNOLDS, Plaintiff,

v.

BOROUGH OF AVALON,
et al., Defendants.

Civ. No. 90–4250.

United States District Court,
D. New Jersey.

Aug. 5, 1992.

Louis J. Greco, McKee City, N.J., for plaintiff.

Patrick Martin, Vincent L. Lamanna Jr., A Professional Ass'n, Sea Isle City, N.J., for defendants Borough of Avalon, Thomas Ciccarone, Richard Light, Richard Dean, Martin Pagliughi, Jeanette Glazier, Dan Hildreth and Charles Curtis.

James A. Waldron, Cape May Courthouse, N.J., for defendants George B. Neidig, Jr. and Mary Monks.

## OPINION

GERRY, Chief Judge.

Plaintiff, Susan Reynolds, alleges that while she was employed as a deputy municipal court clerk for the Borough of Avalon, New Jersey, she was subject to sexual harassment by co-worker, William Johnson, which ultimately led to her constructive discharge and/or involuntary termination from employment. She brings this action against the Borough of Avalon and a number of individual officers and employees of the Borough under various federal civil rights statutes and state tort law. Presently before the court are a motion for summary judgment by all defendants except William Johnson, and plaintiff's motion to amend the complaint to add a § 1983 claim alleging retaliatory discharge arising from plaintiff's exercise of her free speech rights. For the reasons set forth below, defendants' motion for summary judgment will be granted as to the Title VII claims and denied as to all other claims, and plaintiff's motion to amend the complaint will be granted.

### I. Factual Background

During the period of her employment as a court clerk, from July 25, 1987 until November 4, 1988, plaintiff's co-worker, William Johnson, repeatedly made comments to Reynolds of a sexual nature and on a few occasions touched her in a sexually offensive manner. During the summer of 1988, Reynolds complained to her immediate supervisor, Mary Monks, and to her department head, George Neidig, about Johnson's offensive comments. On one occasion she also complained directly to Mr. Johnson and asked that he stop the comments, which he did for a while. On October 15, 1988, Reynolds submitted a letter of resignation to be effective November 15, 1988. The series of events culminated on October 27, 1988, when Johnson stopped plaintiff as she was walking through the boiler room and grabbed her breast, saying

"that's what I had a dream about." That evening she reported the incident to the police. Johnson was subsequently arrested and charged with criminal sexual contact, simple assault, and harassment.

After the arrest, Johnson contacted the mayor, Richard Light, and offered to resign to avoid putting the Borough officials in an "awkward position." The mayor, however, told him that he wanted him to stay, and expressed to Johnson and others that in his view Johnson was "innocent until proven guilty." Subsequently, in a meeting between Mayor Light, Thomas Ciccarone, the Borough Business Administrator, and George Neidig, the head of plaintiff's department, it was decided that Reynolds' employment should be terminated as of November 4, 1988 (eleven days before her resignation would have taken effect). The day after Johnson's arrest, Reynolds received a letter to that effect.

Plaintiff filed this action on October 24, 1990, including discrimination claims under 42 U.S.C. §§ 1981, 1983, 1985(2) and (3), and Title VII, as well as state law claims for constructive discharge and wrongful discharge. Defendants are the Borough of Avalon; William Johnson, the alleged perpetrator; Mary Monks, plaintiff's immediate supervisor; George Neidig, plaintiff's department head; Thomas Ciccarone, the Borough Business Administrator; Richard Light, the mayor; five members of the Borough Council: Richard Dean, Martin Pagliughi, Jeanette Glazier, Dan Hildreth, and Charles Curtis; and John Does one through ten. Defendants base their motion for summary judgment on the following legal grounds: 1) the § 1983 claim against the Borough must be dismissed because plaintiff has failed to establish an official policy or custom which caused the alleged constitutional violations as required under *Monell* and its progeny; 2) the § 1983 claims against Ciccarone and Light must be dismissed because they took no action that violated plaintiff's civil rights; 3) all claims against the five council members must be dismissed on legislative im-

munity grounds; 4) the Title VII claims must be dismissed for plaintiff's failure to pursue administrative remedies; 5) the claims under §§ 1981, 1983, and 1985 are preempted by Title VII and therefore must be dismissed; and 6) the state law claims must be dismissed because defendants are entitled to immunity under the New Jersey Tort Claims Act. We address these issues, as well as plaintiff's motion to amend the complaint, in turn below.

## II. *Municipal Policy or Custom*

■ Defendants argue that the § 1983 claim against the Borough must be dismissed because plaintiff has not pointed to any official policy or custom which caused the deprivation of plaintiff's constitutional rights. *See Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). In *Monell,* the Supreme Court held that under § 1983 municipalities cannot be held directly liable for the unconstitutional acts of their employees under a theory of *respondeat superior.* Rather, the Court held, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." [1] *Id.*

■ The identification of officials having final policymaking authority is a question of state (or local) law, not a question of fact for the jury. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). Since none of the parties in this case have briefed the court with respect to the relevant local law, we cannot make a determination as to this issue at this juncture. We will assume for purposes of this discussion, however, that Mayor Light did have policymaking authority and that plaintiff's immediate supervisor, Ms. Monks, and her department head, Judge Neidig, did not.

---

1. This policy or custom requirement also applies to § 1981 claims against municipalities and government officials. *See Jett v. Dallas*

*Independent School Dist.,* 491 U.S. 701, 734, 109 S.Ct. 2702, 2722, 105 L.Ed.2d 598 (1989).

■ Here the *Monell* analysis is made unusually complicated by the fact that plaintiff is attempting to hold the Borough liable under § 1983 for its *failure* to take action that would have prevented or stopped the harassment by Johnson.[2] In *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), in the context of a claim that a municipality had failed to adequately train its police officers, the Supreme Court outlined the circumstances in which a municipality's failure to act can constitute a "policy" and thus give rise to liability under § 1983. The Court rejected the argument that the policy or failure to act must itself constitute a constitutional violation, *see id.* at 385, 109 S.Ct. at 1203; but held that in order for an omission that is not in itself unconstitutional to support liability as a municipal policy under *Monell*, "a high degree of fault on the part of city officials" must be shown. *Id.* at 396, 109 S.Ct. at 1208 (O'Connor, J., concurring). Thus, only where the failure to act rises to the level of "deliberate indifference" can it be said to constitute a policy for which a municipality can be liable. *Id.* at 388, 109 S.Ct. at 1204. Deliberate indifference can be shown where the "need for more and different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390, 109 S.Ct. at 1205. Additionally, the deliberate indifference must be shown to have caused the constitutional violation. *See id.* at 395, 109 S.Ct. at 1208 (O'Connor, J., concurring).

■ Plaintiff argues that this theory of liability applies here. Certainly, if policy-making officials of the Borough had failed to take action in the face of repeated complaints regarding Johnson's harassment of plaintiff, then deliberate indifference could clearly be shown, *see Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 730 (3d Cir.1989), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990); and if these failures to act could be shown to have *caused* the harassment to continue, then plaintiff would have a viable claim of municipal liability. Here, however, the record indicates that the mayor and the other high level officials who might arguably be said to be policymakers (i.e., Ciccarone and the Council members) did not know of the harassment until *after* the last harassing act had occurred.[3] Thus, their failure to act in the face of actual knowledge of what was happening to Susan Reynolds cannot be said to have been a *cause* of the harassment.

In order to hold the Borough liable for the harassment itself, plaintiff must be able to show that the failure of the policy-making officials to take action to prevent or stop the harassment—in the *absence* of actual knowledge of the particular acts against plaintiff—constituted deliberate indifference. We think such a showing is possible. The *Canton* majority's formulation of the deliberate indifference standard, as turning on the obviousness of the need for more training and the likelihood that

2. In her complaint, plaintiff only alleges wrongful termination (an affirmative act on the part of the Borough officials) as part of her § 1985 and state law claims. Her § 1983 and § 1981 claims are based entirely on defendants' failure to prevent or stop the ongoing harassment. Her proposed amended complaint, however, does include an affirmative act—retaliatory discharge—as part of a claim under § 1983 and § 1981.

3. The last incident (in which Johnson touched plaintiff's breast) occurred on October 27, 1988. The mayor and Ciccarone were informed of Reynold's criminal complaint regarding this incident a few days later in a meeting with the chief of police. There is direct evidence in the record that this was the first that Ciccarone knew of the harassment, *see* Ciccarone's deposition at 68–69, and there is indirect evidence that this was the first that the mayor had heard of it. Ciccarone testified that the mayor appeared shocked when he heard of Reynolds' allegations from the police chief, *see* Ciccarone's deposition at 70; Reynolds testified that she did not tell the mayor and did not ask any one else to tell him, *see* Reynolds deposition at 51–52; and both Monks and Neidig (the only supervisory officials to whom Reynolds complained) testified that they did not tell the mayor. *See* Monks' deposition at 42, Niedig's deposition at 34. Plaintiff has not rebutted this with any evidence that the mayor or Ciccarone did know of her allegations prior to their meeting with the police chief.

the inadequacy will result in the violation of constitutional rights, *see id.*, 489 U.S. at 389, 109 S.Ct. at 1205, does not on its face require actual knowledge of a previous or ongoing violation. In her concurring opinion, Justice O'Connor (joined by Justices Scalia and Kennedy) clearly held that both actual and constructive notice of the need for preventative action can form the basis of a showing of deliberate indifference. *See id.*, at 395, 109 S.Ct. at 1208; *see also Simmons v. City of Philadelphia,* 947 F.2d 1042, 1061 n. 14 (3d Cir.1991) (Becker, J.) (noting that deliberate indifference under the *Canton* standard might be shown where defendants either knew or *should* have known of the constitutional deprivation), *cert. denied,* —— U.S. ——, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992). Thus, Justice O'Connor made clear that certain situations present a potential for constitutional violations by employees that are so obvious and so clearly likely to occur, that a municipality's failure to take preventative action will rise to the level of deliberate indifference even *before* any particular violation has occurred or been brought to the attention of policymakers.

■ An example of this type of deliberate indifference cited by Justice O'Connor (and endorsed by the majority as well) is the failure of a municipality to inform police officers of the constitutional limitations surrounding the use of deadly force. *See Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10 (majority opinion), and 489 U.S. at 396–98, 109 S.Ct. at 1209 (O'Connor, J., concurring). Because police officers are certain to face situations in which they must decide whether to use deadly force, it is obvious that the failure to train police officers as to the constitutional limitations on the use of deadly force "will create an extremely high risk that constitutional violations will ensue." *Id.* at 396, 109 S.Ct. at 1209 (O'Connor, J., concurring). Such a failure might therefore rise to the level of deliberate indifference, even in the absence of actual knowledge on the part of policymakers that such violations had already occurred. *See id.* Similarly, plaintiffs may be able to show that the risk of sexual harassment occurring in the workplace is obvious, and that the failure to inform employees of a policy against sexual harassment and to institute procedures for reporting and investigating such allegations creates an extremely high risk that constitutional violations involving sexual harassment will occur.[4]

**4.** Whether the Borough's inaction in this case constituted deliberate indifference under the constructive notice prong of the standard set forth in *Canton* is primarily a question of fact to be decided by the jury. We note here, however, that the state of the law regarding sexual harassment in the 1980's provides some indicia of the obviousness of the need for employers to take preventative action in 1987 and 1988 when the events at issue here occurred. It was clear at that time that sexual harassment in the workplace was actionable as a violation of the equal protection clause. *See Frazier v. Southeastern Pennsylvania Transportation Authority,* 785 F.2d 65, 70 (3d Cir.1986); *Bohen v. City of East Chicago,* 799 F.2d 1180, 1185 (7th Cir.1986); *Huebschen v. Dep't of Health & Social Services,* 716 F.2d 1167, 1172 (7th Cir.1983) (assuming that "[sexual] harassment ... directed solely at [a] plaintiff because she was a woman" violates equal protection clause); *Skadegaard v. Farrell,* 578 F.Supp. 1209, 1216 (D.N.J.1984); *see also Andrews v. Philadelphia,* 895 F.2d 1469, 1479 (3d Cir.1990) (denying qualified immunity to city officials for sexual harassment claim on ground that "the right to be free of discrimination based upon sex in the workplace, was well grounded in law and widely known to the public by 1986").

Additionally, EEOC regulations have been in effect since 1980, which provide guidelines for employers to follow in preventing sexual harassment, including the institution of reporting and investigation procedures.

An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under title VII, and developing methods to sensitize all concerned.

29 CFR § 1604.11. These guidelines were, of course, promulgated pursuant to Title VII, which imposes different requirements on employers with respect to sexual harassment than does the equal protection clause. They are relevant here, however, as an indication of the extent to which the need for employers to take action to prevent sexual harassment was obvious in 1987. EEOC guidelines, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (quoting

The availability of this constructive notice prong of the deliberate indifference standard set forth in *Canton* is of particularly crucial importance in sexual harassment cases because such incidents are by their very nature far less likely to be reported than other types of constitutional violations. While the types of constitutional violations discussed by the Court in *Canton* —those committed by police officers against citizens—are almost certain to be brought to the attention of high level officials either through citizen complaints or media attention, incidents of sexual harassment in the workplace often go unreported. There are a number of disincentives to reporting peculiar to this type of violation, which stem from the 'social taboos surrounding sexual matters in general, the tendency of victims to feel embarrassment and guilt regarding such incidents, as well as fears that complaints will be ill-received by supervisors and thus impact negatively on the victim's employment status.[5] Thus, it is reasonable to suppose that in the absence of affirmative steps to encourage the reporting of sexual harassment in the workplace, the likelihood that higher level officials in policymaking positions will have knowledge of such incidents in time to take meaningful corrective action is particularly small.

The record presently before us contains evidence indicating that the Borough of Avalon had no policy forbidding sexual harassment, no established and publicized procedure for reporting incidents of sexual harassment, no procedure for investigating such reports, and no policy regarding the disciplining of employees found to have committed such harassment.[6] We hold that a reasonable jury might find that the risk of sexual harassment in the workplace is so obvious that an employer's failure to take action to prevent or stop it from occurring—even in the absence of actual knowledge of its occurrence—constitutes deliberate indifference, where the employer has also failed to take any steps to encourage the reporting of such incidents. Therefore, we find that defendants have failed to demonstrate, as a matter of law, that the failure of Borough officials to prevent or stop the harassment of Susan Reynolds did not constitute a policy for which the Borough can be held liable under § 1983. Defendants' motion for summary judgment against the Borough on this ground will therefore be denied.

## III. *§ 1983 Claims Against Light and Ciccarone*

Defendants argue that the § 1983 claims against Mayor Light and Borough Business Administrator Ciccarone must be dismissed because, to the extent that these defendants caused any injury to plaintiff, their level of fault in so doing amounted to no more than negligence, which is not action-

*General Electric Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976)).

**5.** The reluctance of victims to report sexual harassment has been widely recognized. *See, e.g., Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1507 (M.D.Fla.1991) (finding that formal complaints re: sexual harassment are rare "because the victim of harassment fears an escalation of the problem, retaliation from the harasser, and embarrassment in the process of reporting"); *Silverstein v. Metroplex Communications, Inc.,* 678 F.Supp. 863, 867 (S.D.Fla. 1988) ("it is undoubtedly often true that a victim of sexual harassment will be extremely reluctant to complain about misconduct"); *Broderick v. Ruder,* 685 F.Supp. 1269, 1279 (D.D.C.1988) ("plaintiff and other women were for obvious reasons reluctant to voice their displeasure" about sexual harassment); *Snodgrass v. Brown,* No. 89–1171 (D.Kan. Nov. 26, 1990) (1990 WL 198431) ("sexual harassment victims often fear retribution or being labeled a troublemaker"); Sykes, The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule and Related Legal Doctrines, 101 Harv.L.Rev. 563, 607 (1988) ("victims of sexual harassment may be reluctant to file suit or even to report incidents to their employers for fear of reprisal or a tainted reputation in the labor market").

**6.** According to Susan Reynolds' testimony, she was not informed of any such policies or procedures by either Ms. Monks or Judge Neidig when she complained to them. *See* Reynolds' deposition at 46–48, 94–98. Additionally, Judge Neidig testified that when Ms. Reynolds reported the harassment to him, he told her to report it to the police and to Ms. Monks if it continued. He apparently did not instruct her to report to any higher level Borough official. *See* Neidig's deposition at 28.

able under § 1983. *See Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). As was already discussed·at length in section II, we find that there are disputed issues of material fact on the current record with respect to whether the omissions of policymaking Borough officials constituted deliberate indifference which caused injury to plaintiff. If such deliberate indifference were found, the Borough and the individual policymakers could be held liable under § 1983. *See Sample v. Diecks*, 885 F.2d 1099, 1117–18 (3d Cir.1989) (*City of Canton* standard applies to individual liability for supervisory officials as well as to municipal liability). Thus, for the reasons set forth in section II, defendants' motion for summary judgment against defendants Light and Ciccarone on this ground will be denied.

## IV. *Legislative Immunity*

■ In *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) the Supreme Court held that state legislators are absolutely immune from suits for damages under 42 U.S.C. §§ 1983 and 1985 for actions "in the sphere of legitimate legislative activity." *Id.* at 376, 71 S.Ct. at 788. The Third Circuit has extended this immunity to local legislators as well. *See Aitchison v. Raffiani*, 708 F.2d 96, 99 (3d Cir.1983). Plaintiff argues, however, that legislative immunity does not apply here because, to the extent that the Borough council members were involved in terminating plaintiff's employment and condoning Johnson's actions, they were acting in an administrative rather than a legislative capacity. We agree.

"Legislative acts are those which involve policy-making decisions of general scope ... [w]here the decision affected a small number of people or a single individual, the legislative power is not implicated." *Ryan v. Burlington County*, 889 F.2d 1286, 1290–91 (3d Cir.1989). *See also Donivan v. Dallastown Borough*, 835 F.2d 486 (3d Cir. 1987) (borough council's abolition of the police force through vote rather than through enactment of an ordinance in accordance with the Borough Code did not constitute legislative activity to which im-

munity would attach), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988). Although on the present record there remains a factual dispute as to whether the council members took any actions for which they could be held liable, if they did take any such action with respect to plaintiff's employment status, it was clearly of an administrative rather than a legislative nature, in that it affected only a single individual. Therefore, we will not dismiss plaintiff's claims against the council members on legislative immunity grounds.

## V. *Title VII Claims*

Before a Title VII claim may be brought in a district court, an administrative charge must be filed with the Equal Employment Opportunity Commission. *See* 42 U.S.C. § 2000e–5(f); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Sandom v. Travelers Mortgage Services, Inc.*, 752 F.Supp. 1240, 1246 (D.N.J.1990). Plaintiff admits that she did not pursue any administrative remedies, and she has not responded to defendants' argument that her Title VII claims are therefore barred. Accordingly, plaintiff's Title VII claims will be dismissed.

## VI. *Title VII Preemption of § 1981, § 1983, and § 1985 Claims*

■ Defendants argue that because plaintiff's claims are cognizable both under the Civil Rights Statutes, 42 U.S.C. §§ 1981, 1983, and 1985, and under Title VII, they can only be brought under Title VII because Title VII preempts the other causes of action. This argument is simply wrong, and is clearly based on a misreading of the case law.

First, defendants rely on *Great American Federal Savings and Loan Ass'n v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) for the proposition that § 1985(3) claims are preempted by Title VII. In fact, this case stands for a very different proposition. Section 1985 creates no substantive rights, but merely provides

a civil cause of action where some otherwise defined federal right is breached by a conspiracy in the manner defined by the statute. In *Novotny*, the Supreme Court simply held that a § 1985 plaintiff cannot rely on Title VII for that otherwise defined federal right. *See id.* at 378, 99 S.Ct. at 2352. Where, as here, the § 1985 claim is based on some other federal source, such as the equal protection clause of the Fourteenth Amendment, the fact that the conduct can be said to violate Title VII as well does not operate to bar the § 1985 claim. The Third Circuit has applied this same analysis with respect to § 1983 claims. *See Bradley v. Pittsburgh Board of Education*, 913 F.2d 1064, 1079 (3d Cir.1990) ("Title VII does not preempt section 1983, and ... discrimination claims may be brought under either statute, or both").

Additionally, defendants cite *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) for the proposition that Title VII preempts § 1981 claims, but that case says nothing of the kind. What it does say is that claims of racial harassment are not cognizable under § 1981 because that statute only prohibits discrimination in the formation of employment contracts, not in the conditions of employment that follow the making of such contracts. As with plaintiff's § 1983 and § 1985 claims, we see no reason why the fact that the allegations may also be actionable under Title VII should preclude plaintiff from bringing a claim under § 1981. *See Meade v. Merchants Fast Motorline, Inc.*, 820 F.2d 1124, 1127 (10th Cir.1987) ("plaintiff may properly pursue his cause of action under § 1981 ... despite the applicability of Title VII to the same conduct"). Accordingly, defendants' motion for summary judgment on this ground will be denied.

## VII. *Immunity Under the New Jersey Tort Claims Act*

Defendants argue that they are immune from liability for plaintiff's state law claims under the immunity provisions of the New Jersey Tort Claims Act. N.J.S.A. 59:3–3 confers qualified or "good faith" immunity on public officials for their discretionary acts. In determining whether a public official is entitled to qualified immunity under this section, the New Jersey courts appear to apply the same "objective reasonableness" standard announced by the United States Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), for determining qualified immunity in § 1983 actions. *See Hayes v. Mercer County*, 217 N.J.Super. 614, 526 A.2d 737, 741 (1987). Thus, the question becomes whether each defendant would have reasonably believed that her/his actions were lawful in light of reasonably believed that her/his actions were lawful in light of clearly established law. *See Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. Because defendants have doggedly insisted that their immunity under this statute is absolute, however, neither party has addressed this issue according to the correct standard. Without appropriate briefing from the parties, we are ill-equipped to address this issue at this juncture. Accordingly, we will deny defendants' summary judgment motion as to this ground without prejudice to their right to raise it again accompanied by appropriate legal argument.

Defendants further argue that the Borough is immune from liability under that section of the Tort Claims Act stating that "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J.S.A. 59:2–10. It appears that under this section, the Borough cannot be held directly liable for Johnson's acts of harassment, since they undoubtedly constitute at least "willful misconduct." The acts and omissions with which the other defendants are charged, however—their failure to take action to stop the harassment and retaliatory discharge—do not appear to be covered by this section. Since there is evidence in the record to indicate that these actions were committed within the scope of employment, the Borough may very well be subject to *respondeat superior* liability for them. *See* N.J.S.A. 59:2–2. Therefore, we will not grant summary judgment in favor of the

**450**

Borough with respect to the state law claims on this basis.

### VIII. *Motion to Amend Complaint*

 In support of her motion to amend the complaint to add a claim of retaliatory discharge arising from her exercise of her free speech rights, plaintiff states that discovery has shown that several of the defendants participated in the decision to terminate her employment soon after they learned of her complaint to the Avalon Police Department, and that based on this information she now believes such a claim is warranted. Defendants oppose this motion, pointing out that the Amended Scheduling Order of July 12, 1991 in this case set a deadline of October 7, 1991 for seeking amendments to the pleadings, and arguing that allowing amendment at this late date in the proceedings will be prejudicial to them. *See Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

We must consider F.R.Civ.P. 16(b)'s requirement that scheduling orders only be modified for "good cause" in conjunction with Rule 15(a)'s directive that leave to amend a complaint be "freely given." Because the facts underlying plaintiff's new claim of retaliatory discharge will substantially overlap with those underlying the state law and § 1985 claims for wrongful and constructive discharge included in the original complaint, the addition of this claim should not necessitate a substantial amount of new discovery. Accordingly, we do not find that defendants will be unduly prejudiced by such an amendment.

With respect to.the scheduling order, we note that the order of July 12, 1991 on which defendants rely also directed that all depositions of parties be completed by October 7, 1991. That deadline was subsequently extended until January 31, 1992 by the Second Amended Scheduling Order of January 17, 1992, although no mention of a new deadline for the amendment of pleadings was made in that second order. In light of the fact that a particularly important deposition—that of defendant Neidig—was apparently not completed until late January 1992, little over one month before plaintiff filed this motion to amend on March 6, 1992, we find good cause for an extension of the original deadline for seeking amendment to the pleadings. Therefore, because we find good cause for extending the scheduling order deadline pursuant to Rule 16(b), and because we find that the proposed amendment will not cause undue prejudice to defendants, plaintiff's motion to amend the complaint will be granted.

### IX. *Conclusion*

Accordingly, for the reasons set forth above, defendants' motion for summary judgment will be granted with respect to plaintiff's Title VII claims and denied with respect to all other claims, and plaintiff's motion to amend her complaint will be granted.