Luis MEJIA and Aura Dina Mejia, Plaintiffs,

v.

CITY OF NEW YORK, Airborne Freight Corporation, Brenda Tipton, Daniel McNicholas, and John Skinner, Defendants.

Civil Action No. 96–CV–3007(DGT).

United States District Court, E.D. New York.

Sept. 5, 2002.

Leon Friedman, New York City, for Plaintiffs.

Richard M. Sand, Garden City, NY, for Airborne Freight Corporation.

Alan Vinegrad, U.S. Attorney for the Eastern District of New York, Brooklyn, NY, for Brenda Tipton.

Michael D. Hess, Corporation Counsel of the City of New York, New York City, for City of New York, Daniel McNicholas, and John Skinner.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiffs Luis and Aura Mejia originally brought this § 1983/*Bivens* action against the City of New York, Airborne Freight Corporation, U.S. Customs Service Special Agent Brenda Tipton, and Sergeant Daniel McNicholas and Detective John Skinner of the New York City Police Department ("NYPD") alleging false arrest, false imprisonment, use of excessive force, and malicious prosecution, all in relation to the controlled pickup of a shipment of cocaine. The Mejias also asserted pendent state law claims for false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress against various defendants.

By the Memorandum and Order of October 5, 2000:(1) the City's motion for summary judgment was granted; (2) Airborne's motion for summary judgment was granted with respect to the § 1983 excessive force claims and the intentional infliction of emotional distress claims, but denied with respect to the § 1983 false arrest and malicious prosecution claims, and the state law malicious prosecution claims; (3) Tipton's motion for summary judgment was granted with respect to the *Bivens* excessive force claims and the intentional infliction of emotional distress claims, but denied with respect to the *Bivens* false arrest and malicious prosecution claims; (4) McNicholas's motion for summary judgment was granted with respect to the state law false arrest claims, but denied with respect to the § 1983 false arrest, malicious prosecution, and excessive force claims, and the intentional infliction of emotional distress claims; and (5) Skinner's motion for summary judgment was granted with respect to the state law false arrest and intentional infliction of emotional distress claims, but denied with respect to the § 1983 false arrest, malicious prosecution, and excessive force claims. *See Mejia v. City of New York*, 119 F.Supp.2d 232, 289 (E.D.N.Y.2000).

In addition, Airborne was granted leave to renew its motion for summary judgment on the § 1983 false arrest and malicious prosecution claims on the ground that plaintiffs have not shown that Airborne's alleged constitutional violations resulted

from an official policy of Airborne, and on the state law malicious prosecution claims on the ground that they are untimely.[1] *See id.* Airborne did so on October 16, 2001.

## Background

Familiarity with the facts of this case is assumed, *see id.* at 243–52, but in addition to any new relevant facts, the facts relevant to the current motion are taken from the Memorandum and Order and will be repeated in some detail.

### (1)

There is no dispute over the initial events of this case. On November 18, 1993, U.S. Customs Service agents in Miami intercepted a package from Bogota, Columbia in which more than a pound of cocaine had been hidden in the covers of three books of textile samples. The package had been delivered to Miami by a Columbian express courier for transfer to Airborne, the connecting domestic courier. The airbill identified the recipient as Complete Diagnostic Best Sports Car Service in Hollis, New York, but did not list an individual addressee. The airbill also gave the recipient's phone number.

The Miami Customs officials forwarded the package to Tipton, an agent in the New York Customs office. Because the package contained less than one kilogram of cocaine, the matter fell outside federal prosecution guidelines. Tipton thus contacted Detective McNicholas about the possibility of the NYPD conducting a controlled delivery of the package.

On November 19, 1993, Tipton contacted John Bezmen, Airborne's regional security manager, and asked him to arrange to place an entry in Airborne's computer system to reflect a delay due to misrouting so as not to arouse the suspicion of the unknown recipient. Bezmen agreed to the request and offered to cooperate in any subsequent controlled delivery of the package.

That same day, another Customs Service agent visited Complete Diagnostic, and picked up a business card for the garage which included the name "Luis" and a telephone number that matched the one on the airbill. Tipton and McNicholas first considered having Customs sign over the package to the NYPD for a controlled delivery on the following day, but abandoned the plan because McNicholas believed there would be no way of knowing whether the person who happened to sign for the package at the garage was the intended recipient.

### (2)

At the time of these events, Bezmen was supervised by Donald McGorty, the Airborne's Director of Security for Area 1, which covered the northeast. McGorty Dep. at 12. Bezmen was one of three "investigators" who reported to McGorty, and was stationed at Kennedy Airport. *Id.* at 13.

Bezmen stated in a deposition that he had been involved in "a dozen or so" investigations into shipments of illegal drugs. Bezmen Dep. at 22, 52. The record is not clear, but Bezmen apparently worked for as an investigator for at least five years before the incidents relevant to this case occurred, and perhaps longer.[2]

---

**1.** Also, McNicholas was granted leave to renew his motion for summary judgment on the intentional infliction of emotional distress claims on the ground that they are untimely.

**2.** In an affidavit, McGorty stated that he supervised Bezmen from July 1988 until March 1997. McGorty Aff. ¶¶ 2, 4. In his deposition, McGorty repeated that Bezmen was his investigator starting in July 1988, but that he was not sure when Bezmen had started. McGorty Dep. at 14–15.

The investigations into shipments of illegal drugs would occur when an Airborne employee found drugs in a package, and asked Bezmen's advice on what to do. *Id.* at 23–24. "Usually," Bezmen's only role was to call the police or tell the other Airborne employee to do so. *Id.* However, in some instances, law enforcement officials wanted to do a controlled delivery, so Bezmen gave them uniforms and a van. *Id.* at 27, 51. Airborne employees did not participate in controlled deliveries. McGorty Dep. at 34. Bezmen said that in those situations, he told the other Airborne employee to "just cooperate with what they needed and assist them in any manner they could. That is the normal scenario." Bezmen Dep. at 23–24. McGorty agreed, and added that he wanted Airborne employees to make sure that the law enforcement officers had a warrant before assisting them with a controlled delivery because for "the police to go out without a warrant is fraught with danger." McGorty Dep. at 25–26, 30–32.

Although McGorty was Bezmen's supervisor, he did not actively oversee Bezmen's involvement in controlled deliveries. *Id.* at 15–17. Bezmen never asked McGorty's advice about how to conduct a controlled delivery; nor did McGorty ever review Bezmen's actions in them. *Id.* at 16–17.

At this time, Thomas Gennarelli was an Airborne cartage supervisor at Airborne's Inwood Station who supervised a group of thirty drivers. Gennarelli Dep. at 7. Gennarelli's direct supervisor was District Manager Bill Savino. *Id.* at 13. Gennarelli stated he was involved in approximately three controlled deliveries in his two years as Inwood Station's cartage supervisor. *Id.* at 13–14. In those situations, he provided a van and/or uniforms to the law enforcement officials, and "[t]he norm was to cooperate" with them. *Id.* at 16, 23.

### (3)

At this point in the story, plaintiffs' and defendants' accounts of the events diverge widely. According to the defendants, on November 29, 1993, Tipton spoke to Bezmen, who had previously left a message for her. Bezmen told her that he had noticed an entry on Airborne's computer that indicated someone named "Luis" had called on November 22, 1993, asked about the package, and left the phone number for Complete Diagnostic.[3] Tipton and McNicholas then conferred to make arrangements for a controlled pickup at Airborne's facility the next day, November 30, 1993.

At Tipton's request, Gennarelli called the contact number and asked for "Luis Mejia."[4] A person answered and said: "This is Luis." Gennarelli told "Luis" that his package was available for pickup at Airborne's Inwood station, which is located near JFK. Gennarelli further advised "Luis" that he should come to pick up the package after noon the next day, November 30, 1993. Gennarelli does not recount having to give "Luis" any reasons as to why he was required to pick up the package at the Airborne office as opposed to it being delivered to Complete Diagnostic; Gennarelli stated that "Luis" simply agreed without asking any questions. According to Gennarelli, the call lasted approximately two minutes. After the call, Gennarelli advised Tipton that "Luis" said

---

3. No copy of this computer entry has been produced, and the computer file no longer exists.

4. Tipton claims that at this point she did not know, and thus Gennarelli could not have used, Mr. Mejia's last name in this phone call. Gennarelli, however, maintains that Tipton gave him Mr. Mejia's last name, and he used it. *See Mejia,* 119 F.Supp.2d at 244 n. 2.

he would come to Airborne's facility the next day to pick up the package.

On November 30, 1993, Tipton brought the package to Airborne's Inwood station and signed it over to Detective Skinner. According to Tipton, she had no further role in the controlled pickup, though she remained at the facility until Mr. Mejia arrived.

Skinner placed the intercepted package in an Airborne box, sealed it, and gave it to Gennarelli. The police then waited for Mr. Mejia's arrival out of sight in prearranged positions.

Later that day, Mr. Mejia set off for the Airborne office along with his wife. Along the way, he got lost and had to call for directions. Gennarelli answered, or was given, the call and provided Mr. Mejia with additional directions. Shortly thereafter, Luis Mejia entered Airborne's facility and walked up to Gennarelli, who was wearing an Airborne uniform. Mr. Mejia signed for the package, accepted delivery, and walked out. According to Gennarelli, Mr. Mejia did not inspect the package while he was in the office or indicate in any way that the package was unexpected. According to Skinner, who was watching from the reception area of the Airborne office, once back in the car, Mr. Mejia handed the package to his wife, who immediately opened it.

About ten minutes later, McNicholas, Skinner, and several other NYPD officers pulled the car over to the side of the road and arrested the Mejias.

(4)

The Mejias tell a very different story about the events leading up to their arrest and prosecution. In essence, the Mejias allege that they knew nothing about the package from Colombia and that Airborne representatives (or government agents masquerading as Airborne representatives) coaxed and cajoled them into claiming the package under the pretense that the package was a Christmas gift from Venezuela.

Specifically, Mr. Mejia denies that he placed a call to Airborne inquiring about the package. Mr. Mejia testified in deposition that one of his employees, Charlie Diego, received a telephone call on November 22, 1993, from an unidentified individual who asked who owned the business. Diego told the caller the owner was named Luis. The caller also allegedly asked whether the owner was Colombian and whether everyone who worked at the garage was Spanish.

Thereafter, Mr. Mejia states that he received four unsolicited phone calls from Airborne in which one or possibly two purported Airborne agents beseeched him to come to the Airborne facility and pick up the package. The first alleged call took place early on the morning of November 29, 1993. The first caller asked him if he was "Luis" and told him that Airborne had a package for him. Mr. Mejia then stated: "Okay, why don't you deliver it." The caller responded that Airborne could not deliver the package because it was a personal package and that he would have to come and sign for it: "You have to come personally to pick up the package because it is addressed to you." Mr. Mejia then stated that he could not pick up the package that day because he was too busy. Mr. Mejia asked whether Airborne could just deliver the package for an extra charge, which he would pay. The caller answered that he could not do so, again, because the package was personal.

At that point, Mr. Mejia asked where the package was from, to which the caller responded: "Caracas, Venezuela." Mr. Mejia then had a conversation off the phone, in which he asked his wife whether she was expecting a package from Vene-

zuela. When his wife answered no, Mr. Mejia "went back to the phone and told the man and said, 'Are you sure it is coming from Venezuela?' " The caller answered yes. Mr. Mejia then asked the caller to describe the package. After a number of questions along that line, the caller said:

> Look, this package, it was supposed—this package is supposed to be picked up few days going on, if you're not picking up the package, we are going to send it back and I'm going to get into trouble, because this package, I suppose [sic] to send it out and I forgot to send it out.... So please come and pick it up .... [sic] Put it away for you and you just come and take out this package.

Mr. Mejia then asked: "But where [sic] is the package?" The caller replied: "Looks like a Christmas present." Mr. Mejia again advised the caller: "Bring it to me and I will pay." The caller again stated that he could not do so because the package was already two days late and gave Mr. Mejia "a whole story about the package. Came through Miami also, the whole story." The caller added that the package would be sent back to Venezuela if he did not pick it up and again emphasized that it was a Christmas present.

Finally, Mr. Mejia stated that he "might pick it up later on," and asked for directions. At that point, Mr. Mejia and the caller had a conversation about the best route to take. The conversation ended with Mr. Mejia telling the caller that he would pick up the package, "[p]erhaps ... today, I don't guarantee that."

Mr. Mejia testified that the call lasted over twenty to twenty-five minutes; later, he stated that it was probably even longer, between thirty and forty-five minutes. At no time during the call, however, did the caller use his last name.

The second alleged conversation occurred later on the afternoon of the 29th, around 2:30 p.m. or 3:00 p.m., when an unidentified, purported Airborne representative told Mr. Mejia: "We're waiting." Mr. Mejia replied: "I'm sorry, I forgot about it but I definitely [sic] pick it up tomorrow." Mr. Mejia then hung up. Mr. Mejia believes the individual who made the second call was not the first caller.

Two more calls were allegedly made on November 30, 1993. The first came at about 9:30 a.m. or 10:00 a.m. Mr. Mejia believes this caller was the first caller from the day before. This caller asked: "Yes, what happened, you coming today?" Mr. Mejia responded: "I don't know. I think I will not be able to. Why don't you call me back later." With that, Mr. Mejia hung up.

The fourth call came that afternoon, at about 1:30 p.m. or 2:00 p .m. This caller, apparently the same one who had made the first and third calls, said: "Luis, you going to do me a favor or not, you picking up this package?" Mr. Mejia then states that he finally decided to go pick up the package because the caller convinced him it might be a Christmas present for his daughter.[5] Mr. Mejia asked the caller how he knew it was present. The caller explained that he had jiggled the box and heard bells inside.[6] Mr. Mejia then made additional inquiries regarding the descrip-

---

**5.** When asked whether this was the first time he was told the package might be a Christmas present, Mr. Mejia answered, "Yes," thus contradicting his testimony that the Christmas present suggestion was made during the first call, the day before. *Compare* Luis Mejia

Dep. at 98 (account of first call), *with id.* at 172 (account of fourth call).

**6.** Mr. Mejia later testified that the remark about the bells was made during the first conversation.

tion of the package. The caller ended by suggesting that he hurry over because the office was closing early.

Ultimately, Mr. Mejia relented and decided to pick up the package. According to Mr. Mejia, the only reason he did so was because his wife wanted to pick up some fresh chickens at a store that the last Airborne caller indicated was near the Airborne office. So, he and his wife left the garage for the Airborne office. Along the way, they got lost, and Mr. Mejia called for directions. A woman answered the phone and said: "Luis?" Mr. Mejia said "yes," and the woman gave him additional directions.

When he and his wife arrived at the Airborne facility, Mr. Mejia was met by Tipton, who was wearing an Airborne uniform.[7] Mr. Mejia then signed for the package, and Tipton released it to him.

### (5)

Mr. Mejia's account of the four telephone calls in which he was told the package was from Venezuela is corroborated by two pieces of physical evidence. The first is the Airborne airbill that was attached to

the package when he picked it up from the Airborne office. Unlike the IBC airbill attached to the original packaging, which indicated the sender's address to be in Bogota, Columbia, the new Airborne airbill listed the sender's address simply as "Caracas ."[8] None of the defendants claim responsibility for creating the Caracas airbill.[9]

The second piece of evidence is the Airborne box into which Detective Skinner placed the original package before the pickup. The exterior of the box carries a routing slip which indicates various airport codes. Pertinently, the section marked "ORIGIN" bears the notation "CAR," which appears to be an attempted reference to Caracas.

Although Gennarelli initially denied playing any role in the repackaging of the shipment other than bringing Skinner a box and some tape, and stated that he was not even in the room at the time, he admitted later in his deposition that he filled out the entire routing slip, including the designation of CAR as the origin.[10] When

---

**7.** Mr. Mejia's testimony on this point contradicts that of Gennarelli and the other defendants, who state that it was Gennarelli who gave Mr. Mejia the package.

**8.** There are other discrepancies between the two airbills. Whereas the original IBC airbill did not list an individual addressee, the Airborne airbill reads "Hold for Luis" in a section for the receiver's address marked "ATTN (NAME/DEPT)." The name "Luis," along with certain illegible letters, also appears in a section marked "RECEIVER'S AIRBORNE EXPRESS ACCOUNT NO." Finally, whereas the IBC airbill listed the sender's name as "GABRIEL JARAMILLO LARA," the section of the Airborne airbill marked "SENT BY (NAME/DEPT)" reads "None."

**9.** The only individual who admitted that he recognized the new airbill was Detective Skinner. Skinner stated that the new airbill had already been prepared by someone else

when he was repackaging the portfolios at the Airborne office and that he did nothing more than place the airbill into the plastic sleeve on the face of the Airborne box. Skinner Dep. at 39. Detective Skinner did not indicate who gave him the new airbill and stated that he did not recognize the handwriting on it. *Id.* at 39–40.

Gennarelli gave apparently conflicting testimony on the existence of the new airbill. At one point in deposition, he stated that the package had a "label" on it when he gave it to Mejia, Gennarelli Dep. at 43–44, but later stated that he did not know whether the package had anything on it that would indicate who the addressee was when Mejia took it. *Id.* at 68–69, 72.

**10.** Gennarelli's initial denial that he played any active role in repackaging the portfolios was further contradicted by Skinner's testimony that he had tried to tape up the box but

asked what "CAR" stands for, Gennarelli replied: "Just initials." Gennarelli further stated that he did not remember who, if anyone, told him to put CAR on the package, and did not know what it meant. Although Gennarelli admitted that Tipton told him to put a particular airbill number on the routing slip, he denied that Tipton or anyone else had told him that the package originated in Caracas. Gennarelli further denied that anyone had instructed him to tell Mr. Mejia that the package was from Caracas. Notably, Tipton and Skinner were together in the room where the shipment was being repackaged throughout the time it was being repackaged, and McNicholas entered the room when Detective Skinner was finishing taping the box.

In addition, two aspects of Mr. Mejia's account of the four calls and their content are corroborated by testimony of certain of the defendants. First, whereas Gennarelli does not recount having to give "Luis" any reasons why he had to come to Airborne to pick up the package and testified that "Luis" readily agreed to do so, Tipton's notes indicate that Gennarelli had given "Luis" "several reasons [why it] could not be delivered," though she could not recall what those "several reasons were."

Second, Mr. Mejia's account that he received more than one telephone call from a purported Airborne agent is corroborated by Skinner's deposition testimony. Although defendants represented in their original motion papers that the only call placed to Mr. Mejia was Gennarelli's call on November 29th, Skinner testified that on November 30th, after finishing the repackaging of the portfolios, "[w]e sat around, conversated [sic], eventually, I believe, someone, I don't know who it was, I don't remember who it was, said 'I'm going to attempt to call this person again.'" Skinner stated that Mr. Mejia arrived a "short time later." Based on Skinner's daily activity report, which puts the time of Mr. Mejia's arrival at 2:45 p.m., this unidentified individual's call appears to coincide with Mr. Mejia's estimate that he received a fourth call from a purported Airborne agent at around 1:30 p.m. to 2:00 p.m. on November 30th.

### (6)

The events subsequent to the arrest are not in dispute. After the arrest, Skinner swore out an arrest affidavit charging the Mejias with Criminal Possession of a Controlled Substance in the First Degree, in violation of New York Penal Law § 220.21.

Thereafter, state grand juries were convened. Skinner and Tipton testified at the grand jury, but McNicholas, Gennarelli, and Bezmen did not. Mrs. Mejia was not indicted, but Mr. Mejia was. Mr. Mejia was tried in the New York Supreme Court for Queens County, and was acquitted on March 20, 1995. Tipton, Skinner, McNicholas, Bezmen, and Gennarelli all testified at the trial.

On March 18, 1996, the Mejias served a notice of claim on the City, alleging false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress.

On June 17, 1996, the Mejias commenced this action, asserting: (1) causes of action under § 1983 against Tipton, McNicholas, Skinner, and Airborne, for false arrest, excessive force, and malicious prosecution; (2) state law causes of action for false arrest, false imprisonment, and intentional infliction of emotional distress against McNicholas, Skinner, and the City; and (3) state law causes of action for mali-

---

that his attempt did not look very professional. Skinner Dep. at 36–37. He, therefore, asked "Gennarelli or someone else from Airborne" to assist him with taping the box, which that person did. *Id.* at 37.

cious prosecution and intentional infliction of emotional distress against Airborne.

### (7)

At the time of these events, Airborne had a general policy on "Business Conduct, Prohibited Practices, and Internal Controls." *See* Defendant's Reply Memorandum of Law in Support of its Motion for Summary Judgment ("Def. Reply Mem.") Ex. D. Under the "Business Practices" section, this policy stated:

1. All Airborne Express employees must act in a legal, moral, and ethical manner at all times.

2. Illegal behavior by any employee in the performance of company duties is not tolerated. Neither ill-advised overzealousness nor failure to ask timely advice of counsel is accepted as an excuse.

3. Documents supporting business transactions must accurately describe the pertinent events. Such must not be false, distorted, or misleading. This includes all types of freight bills, as well as original and corrected invoices.

*Id.* Under "Prohibited Practices," the policy stated:

This policy prohibits:

. . .

● deliberately inaccurate or misleading accounting entries, air waybills, or any other transaction documents.

THERE ARE NO EXCEPTIONS TO THIS POLICY.

*Id.* (emphasis in original).

In 1997, after these events occurred, Airborne adopted a specific policy dealing with "Security Procedures for Shipments of Suspected Illegal Drugs." Plaintiffs' Rule 56.1 Statement ("Pl.St.") Ex. D. The policy outlines procedures for dealing with suspect packages, assisting law enforcement personnel, and law enforcement actions/requirements. *See id.*

### Discussion

As with all motions for summary judgment, where there is a disagreement to the facts, all inferences will be drawn in favor of the Mejias, and all factual assertions will be viewed in the light most favorable them. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Accordingly, it will be assumed that Airborne employees made four phone calls to Mr. Mejia to convince him to come to the Airborne office to pick up the package, that they altered the packaging and the airbill, and that Airborne employees knew the package was from Columbia when they told Mr. Mejia it was from Venezuela. *See Mejia,* 119 F.Supp.2d at 257–58.

The Memorandum and Order of October 5, 2000 extensively discussed whether defendant Airborne had probable cause for its actions regarding the arrest and prosecution of the Mejias, whether qualified immunity was available to a private actor such as Airborne, and whether Airborne was entitled to qualified immunity in this case. *See id.* at 256–75. After concluding that genuine issues of material fact existed as to probable cause and whether it was objectively reasonable for Airborne to believe its behavior was patently abusive (thus precluding qualified immunity), the Memorandum and Order turned to an issue not raised by either party. *See id.* at 275. Throughout its argument, Airborne assumed that it could be held liable under § 1983 for the actions of its employees, and thus did not address whether this was, in fact, correct. *See id.* Accordingly, although summary judgment was denied, Airborne was granted leave to renew its motion on the ground that it was not liable for its employees' actions. *See id.* at 277, 289.

As discussed in the Memorandum and Order, neither a municipality nor a private corporation can be held vicariously liable under § 1983 for the actions of its employees. *See Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978) (no vicarious liability for municipality); *Rojas v. Alexander's Dep't Store*, 924 F.2d 406, 408–09 (2d Cir.1990) (no vicarious liability for private corporation when department store's "Special Police Officer" deputized under New York law for the purpose of arresting shoplifters arrested a customer); *see also Mejia*, 119 F.Supp.2d at 275 (listing cases). However, under *Monell*, a municipality may be found liable for a § 1983 violation "where the municipality *itself* causes the constitutional violation at question." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989) (emphasis in original). It is only "when the execution of the government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38. This aspect of *Monell* has also been applied to private corporations. *See Rojas*, 924 F.2d at 408–09.

There has been no suggestion in this case that Airborne had an actual official policy that led to Mejias' alleged constitutional deprivations. *See Mejia*, 119 F.Supp.2d at 275. However, an actual policy is not the only way by which liability may attach under *Monell*. A municipality or a private corporation can be liable under *Monell* for the single act of an employee with final policymaking authority in the particular area involved. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 121–23, 108 S.Ct. 915, 923–24, 99 L.Ed.2d 107 (1988) (plurality opinion); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (plurality opinion); *see also Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728–29 (4th Cir. 1999) (applying *Pembaur* to private corporation). The Memorandum and Order noted that Bezmen and Gennarelli did not appear to be the types of employees that courts have held to be final policymakers, but as this issue was only raised *sua sponte*, it granted Airborne leave to renew its summary judgment on this basis. *See Mejia*, 119 F.Supp.2d at 275–77.

Airborne did so on October 16, 2001, arguing that the two employees were not final policymakers. In response, the Mejias argued that Bezmen and Gennarelli were final policymakers, and raised a point not addressed in the Memorandum and Order. In a § 1983 case, a plaintiff may show that a municipality is liable for the acts of its employees not only by demonstrating an actual official policy or by the actions of an employee with final policymaking authority, but also by showing that an omission or failure to act by the municipality that is so significant as to constitute "deliberate indifference" to the rights of individuals. *See City of Canton*, 489 U.S. at 389, 109 S.Ct. at 1205; *see also Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir.2000). These cases often involve the allegation a municipality's failure to properly train its employees led to the constitutional deprivation. *See, e.g., Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir.1992). In effect, the municipality's omission in the face of an obvious need for better training or a policy is said to be "a policy of not taking reasonable steps" that are clearly necessary. *City of Canton*, 489 U.S. at 390, 109 S.Ct. at 1205.

Although the Memorandum and Order did not mention the possibility of renewing the summary judgment motion on this basis, it is appropriate to consider the argu-

ment. The point of granting leave to renew was to determine whether Airborne could be liable for the acts of its employees, and it theoretically could be liable if it was found to have been deliberately indifferent to the rights of the Mejias. This issue will be considered first, before turning to the question of whether Bezmen and Gennarelli were final policymakers.

### (1)

### Deliberate Indifference

As noted above, *City of Canton* established that a municipality could be liable for the acts of its employees not only for an actual policy, but also for its omissions. *See Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995); *Villante v. Dep't of Corr.*, 786 F.2d 516, 519 (2d Cir.1986). These typically take the form of failure to train and failure to supervise claims, as in *Walker* and *Vann*, respectively. The Mejias argue that Airborne should be liable for the acts of its employees because it failed to have a policy on how employees should assist law enforcement authorities, particularly in the setting of controlled deliveries and pickups. Although there is no Second Circuit precedent regarding the failure to have adequate policies, several other circuits, and district courts both in and out of the Second Circuit, have held that these claims, which are often intertwined with failure to train claims, can constitute an omission under *City of Canton*. *See Vineyard v. County of Murray*, 990 F.2d 1207, 1212 (11th Cir.1993); *Rhyne v. Henderson County*, 973 F.2d 386, 392–93 (5th Cir1992); *Oviatt v. Pearce*, 954 F.2d 1470, 1478 (9th Cir.1992); *Gibson v. City of Chicago*, 910 F.2d 1510, 1521–22 (7th Cir. 1990); *Avery v. County of Burke*, 660 F.2d 111, 113 (4th Cir.1981) (pre-*City of Canton*); *see also Vogelsang v. County of Cayuga*, 1998 WL 146293, at *5–6 (N.D.N.Y. Mar.25, 1998); *Doe v. Estes*, 926 F.Supp. 979, 987–88 (D.Nev.1996); *Reyn-*

*olds v. Borough of Avalon*, 799 F.Supp. 442, 445–47 (D.N.J.1992); *DiLoreto v. Borough of Oaklyn*, 744 F.Supp. 610, 623–24 (D.N.J.1990); *Timberlake v. Benton*, 786 F.Supp. 676, 696 (M.D.Tenn.1992).

For all of these claims, the municipality is only liable where its failure reflects a deliberate or conscious choice. *See City of Canton*, 489 U.S. at 389, 109 S.Ct. at 1205. Only then does the decision not to train, supervise, or have a policy become a policy for which the municipality is responsible under *Monell*. *See id.* at 390, 109 S.Ct. 1197. That is, when "the need for more or different training" or, in this case, a policy, "is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent." *Id.* As an example, the Supreme Court stated in *City of Canton* that since city policymakers know for a moral certainty that their police officers will be required to arrest fleeing felons, and having armed its officers with firearms, the need to train its officers in the constitutional limitations on the use of deadly force is so obvious that the failure to do so would be deliberate indifference. *See id.* at 390 n. 10, 109 S.Ct. at 1205 n. 10.

In the closely related context of a failure to train claim, Justice O'Connor, in her concurrence and dissent in *City of Canton*, set out two ways in which a plaintiff could establish deliberate indifference. "First, a municipality could fail to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Id.* at 396, 109 S.Ct. at 1209 (O'Connor, J. concurring in part and dissenting in part). This method is typified by the example given by the majority noted above, and has been described as giving the municipality constructive notice. *See id.* at 396, 398, 109 S.Ct. at 1209, 1210; *Reynolds*, 799

F.Supp. at 446–47. Second, "municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." *Id.* at 397, 109 S.Ct. at 1209. In these situations, "a pattern of constitutional violations could put the municipality on notice that its officers confront the particular situation on a regular basis, and that they often react in a manner contrary to constitutional requirements." *Id.* (citing several circuit court cases, including *Fiacco v. Rensselaer,* 783 F.2d 319, 327 (2d Cir.1986)).

Decisions of courts addressing claims of the failure to have a policy also generally fall into these categories. Several cases address actual notice situations. *See Vineyard,* 990 F.2d at 1212 (deliberate indifference when "it was not unusual to receive complaints" about police officers, but the municipality had no policies on supervision, discipline, and training of officers); *Oviatt,* 954 F.2d at 1478 (deliberate indifference when the sheriff knew of at least 19 prior instances in which individuals remained in jail for some period after they missed arraignment); *DiLoreto,* 744 F.Supp. at 623–24 (obvious need for policy shown when taking detainee to the bathroom "is not an uncommon occurrence"); *Timberlake,* 786 F.Supp. at 696 (need for a policy on non-custodial investigatory strip-searches obvious when such searches have been conducted on numerous occasions). Others address three different ways by which a municipality could be on constructive notice. First, in some cases the need for a policy is obvious because, as described by the majority in *City of Canton* when it gave the example of the need for police training in the use of deadly force, there is a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face. *See Gibson,* 910 F.2d at 1521 (deliberate indifference when the city failed to have a policy on the

recovery of firearms and ammunition from officers placed on medical leave as mentally unfit for duty); *Rhyne,* 973 F.2d at 392–93 (deliberate indifference possible if police department had an inadequate policy on monitoring known suicidal inmates, but policy of checking on them every five to ten minutes is not indifference). Second, the need for a policy has been found when the danger of a constitutional deprivation is high but the victim has strong disincentives against reporting it, for example, when there are allegations of sexual harassment or sexual abuse of children. *See Estes,* 926 F.Supp. at 988 (need for policy on sexual abuse of children by school officials because children are more vulnerable than adults and less likely to report abuse); *Reynolds,* 799 F.Supp. at 447 (need for sexual harassment policy because "these incidents by their very nature are far less likely to be reported than other types of constitutional violations"). In these situations, the presence or extent of serious problems within a particular organization are often hidden by the strong disincentives to report, but the existence of such problems is generally known to the public. Accordingly, these courts held that the failure of an organization to take prophylactic measures can rise to the level of deliberate indifference, even in the absence of actual knowledge of abuse or harassment. *See Estes,* 926 F.Supp. at 988; *Reynolds,* 799 F.Supp. at 447. Third, in one pre-*City of Canton* case, the court held a board of health liable when it failed to promulgate regulations required by statute on protecting the health of citizens. *See Avery,* 660 F.2d at 114–15 (failure to have a policy resulted in health workers advising an individual with the sickle cell trait to get sterilized).

It is noteworthy that although courts regularly apply the deliberate indifference standard to municipalities, there are very

few cases it which a plaintiff tried to apply it to a private corporation.[11] None of the cases directly address this issue, but all them held the private corporation not to have been deliberately indifferent. *See Lux v. Hansen*, 886 F.2d 1064, 1067 (8th Cir.1989) (referring to *City of Canton* and finding no evidence of failure to train by private mental health center); *Robinson v. City of San Bernardino Police Dep't*, 992 F.Supp. 1198, (C.D.Cal.1998) (plaintiff failed to prove that nursing company was liable for inadequate training because he only addressed the training of one employee); *Forbes v. Rhode Island Bhd. of Corr. Officers*, 923 F.Supp. 315, 324–25 (D.R.I. 1996) (applying standard and finding no evidence that a union's failure to adopt a procedures on appealing a member's termination was deliberate indifference); *Alber v. Ill. Dep't of Mental Health and Developmental Disabilities*, 786 F.Supp. 1340 (N.D. Ill.1992) (applying standard and finding no evidence that the private manager of a mental health facility failed to adopt a policy regarding the non-consensual admissions of two individuals was deliberate indifference).

There does not appear to be any reason not to apply the deliberate indifference standard to private corporations where it is appropriate. However, there should be far fewer private actors than government entities for whom the need for more or different training, supervision, or policies is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers could be deliberately indifferent. For a private corporation such as Airborne that interacts with law enforcement in a way that could affect the constitutional rights of individuals, the requirements of *City of Canton* in theory could be applicable. In any case, it is not necessary to decide this issue here, and it

will be assumed that Airborne could be found to be deliberately indifferent.

■ Nevertheless, whether a private corporation such as Airborne should have a policy presents a significantly different question than whether an arm of the government should have one. Government actors expect to and regularly and repeatedly do take actions that affect the constitutional rights of individuals; Airborne did so on very rarely. In his at least five years as an inspector, Bezmen only interacted with law enforcement "a dozen or so" times. Similarly, Gennarelli interacted with these authorities three times in his two years as the cartage supervisor at Airborne's Inwood Station. There is simply no question that the need for Airborne or other private corporations that rarely take actions that may affect the constitutional rights of individuals to have a policy (or more or different training or supervision) will almost never be "so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent." *City of Canton*, 489 U.S. at 390, 109 S.Ct. at 1205.

Airborne first argues that, contrary to plaintiffs' claim, it did have a policy that banned its employees from engaging in the alleged activities. Airborne points to its general policy on "Business Practices" that forbids its employees from acting illegally, from taking "ill-advised or over-zealous" actions, and from falsifying documents, and to its written "Prohibited Practices" that include deliberately creating inaccurate or misleading documents. However, this policy is too general to shield Airborne from liability. As the plaintiffs point out, every government agency has a policy to uphold the Constitution and other laws,

---

**11.** Neither party addressed this question.

but this is not enough to protect them from § 1983 liability. The only part of this policy that is arguably specific enough is the prohibition against falsifying documents. But this policy does not appear to be directed at situations in which Airborne employees assist law enforcement officials.[12] An Airborne employee could easily believe that he or she should ignore the policy in order to facilitate the efforts of law enforcement officials. Accordingly, Airborne's stated policy on "Business Conduct, Prohibited Practices, and Internal Controls" does not entitle it to summary judgment.

Airborne next argues that all of the cases cited by the Mejias are distinguishable. In effect, Airborne contends that there was no notice about an obvious need for a policy on interaction with law enforcement without which it was so likely that a violation of constitutional rights would occur that Airborne could reasonably be said to have been deliberately indifferent. *See id.* at 390, 109 S.Ct. at 1205.

At the outset, it is again worth noting that Airborne rarely interacted with law enforcement in a way that could affect the constitutional rights of individuals. Unlike a government entity such as a police department, Airborne had much less notice of any kind that it needed a policy to constrain the actions of its employees.

In addition, Airborne did not have any of the kinds of actual or constructive notice courts have applied to government entities accused of failing to have adequate policies. Airborne did not have actual notice of other, similar violations and still refused to establish a policy. There is no evidence of any previous complaints that Airborne employees had violated the constitutional

rights of individuals in any way, or specifically had lured people into picking up packages that contained illegal drugs by repeatedly calling them or by telling them that the package had been sent from a different country than it actually was.

As for constructive notice, certainly there was no relevant statute that required Airborne to have such a policy, as in *Avery.* Nor is this a situation in which the victims had strong disincentives to report violations. Unlike the problems of sexual harassment and sexual abuse of children, the victims of false arrest and malicious prosecution quite clearly have strong incentives to report alleged violations.

This only leaves the constructive notice method described by the majority in *City of Canton* through its example of the obvious need for police training in the use of deadly force against fleeing felons. In the context of failure to train cases, the Second Circuit derived from *City of Canton* a three-part test to determine if a municipality had constructive notice on this basis: (1) the policymaker must know "to a moral certainty" that its employees will confront a given situation; (2) the situation must either present the employee with a difficult choice that training or supervision will make less difficult, or be one with a history of being mishandled by employees; and (3) the wrong choice by the employee will frequently cause the deprivation of constitutional rights. *See Walker,* 974 F.2d at 297–98 (citing *City of Canton* ). This test has not been applied in any district or circuit court in the Second Circuit in the rare case in which the plaintiff alleges a failure to have a policy, but a Third Circuit court did do so. *See Carter v. City of Philadelphia,* 181 F.3d 339, 357 n. 61 (3d

12. Airborne's policy document begins by stating that its objectives are to ensure compliance with Foreign Corrupt Practices Act of 1997 and to document additional requirements that represent Airborne's policy on business conduct, prohibited practices, and internal controls. Def. Reply. Mem. Ex. D.

Cir.1999). And as the test is derived directly from *City of Canton*, there does not appear to be any reason not to apply it to this closely-related situation.

Plaintiffs argue that since Airborne employees were involved in at least a dozen situations involving drug shipments in which they interacted with law enforcement officials, there was "a need" for a policy on cooperation with law enforcement. Def. Mem. at 13–14. However, to meet the test of *City of Canton* and the first prong of *Walker*, plaintiffs must show that Airborne policymakers knew to a moral certainty that their employees would confront this situation. This prong appears to have two elements. First, there must be some need for a policy regarding "a given situation." *Walker*, 974 F.2d at 297. This language seems to contemplate a significant level of specificity regarding the situation to be confronted by the employees. Second, the given situation must occur so frequently as to be a moral certainty. Thus, "a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events." *Walker*, 974 F.2d at 297. Moreover, "a single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of a custom or a policy." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993).

Plaintiffs have not shown that Airborne policymakers knew to a moral certainty that its employees would confront this given situation. Moreover, it is significant that the "dozen or so" other situations involving drug shipments in which Airborne employees interacted with law enforcement officials were different than the one in this case. Bezmen and McGorty testified that the other situations involved controlled *deliveries* of a package to the intended recipient, in which the only role of Airborne employees was to provide information about the package and give uniforms and vans to law enforcement officers. McGorty Dep. at 34. Here, on the other hand, Bezmen and Gennarelli helped the police conduct a controlled *pickup* in which they lured Mr. Mejia into coming to the Airborne office to pick up the package. McGorty testified that he was not aware of any other controlled pickups in which Airborne employees participated. McGorty Aff. ¶¶ 6–7. As there is no evidence that Airborne employees were involved in a controlled pickup at any other time, it could not have been obvious to a moral certainty to Airborne policymakers that their employees would face such a situation. Failing to have a policy for this rare and unforeseen event thus cannot be deliberate indifference.

The distinction between a controlled delivery and a controlled pickup is relevant because the two situations present a very different potential for constitutional violations by Airborne employees. In the controlled deliveries, Airborne employees did nothing more than provide information, uniforms, and a van to law enforcement officers. There does not appear to be any significant potential for this to result in Airborne employees being the cause of constitutional violations, particularly since these employees did not actually participate in the controlled deliveries. On the other hand, Airborne employees in this case actively helped law enforcement officers conduct the controlled pickup by calling Mr. Mejia four times, fabricating or relating a story to convince him to come to the Airborne office, and altering documents that showed the package's routing and origin. As discussed in the Memorandum and Order, a jury could find that these activities violated Mr. Mejia's constitutional rights. Clearly, then, a pickup presents a much greater chance of constitutional violations by Airborne employees

than a delivery does.[13] Accordingly, plaintiffs have not satisfied the first prong of *Walker.* Airborne was not on constructive notice that it needed a policy to address the behavior of its employees during controlled pickups.

As the Mejias have also failed to satisfy the other methods of showing deliberate indifference, they cannot defeat summary judgment with the argument that Airborne's failure to have a policy regarding interactions with law enforcement officials makes it liable for the acts of those employees.

### (2)

### Final Policymaking Authority

Another method by which a municipality can be liable under § 1983 for even a single unconstitutional act of its employee is when that employee had final policymaking authority in the specific area involved. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 121–23, 108 S.Ct. 915, 923–24, 99 L.Ed.2d 107 (1988) (plurality opinion) (only municipal officials with "final policymaking authority" can, by their actions, subject the municipality to § 1983 liability); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (plurality opinion) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."); *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38 (municipal policy made "by those whose edicts or acts may fairly be said to represent official policy"). This premise and the principles associated with it have been extended to private corporations. *See, e.g., Austin v. Paramount*

*Parks, Inc.,* 195 F.3d 715, 728–29 (4th Cir. 1999); *Smith v. United States,* 896 F.Supp. 1183, 1187 (M.D.Fla.1995) (citing *Harvey v. Harvey,* 949 F.2d 1127 (11th Cir.1992)).

As noted in the Memorandum and Order of October 5, 2000, courts have held that corporate employees at the level of Bezmen and Gennarelli do not have final policymaking authority. *See Mejia,* 119 F.Supp.2d at 275–76 (citing *Austin,* 195 F.3d at 729–30; *Smith,* 896 F.Supp. at 1186; *Miller v. Corr. Med. Sys., Inc.,* 802 F.Supp. 1126, 1132 (D.Del.1992)). This is so because, for the organization to be liable, the employee must have the authority to make final policy for it, and in a large corporation employees at the level of a regional security manager and a cartage supervisor do not have the authority to make final policy for the corporation. Nevertheless, the issue is more complicated than it at first appears.

Whether the official in question possessed final policymaking authority is a legal question to be determined by the court and not a jury, *see Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989); *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir. 2000), and is usually accomplished by consulting state law on the authority of various government officials. *See id.* Obviously, state law is irrelevant here as the claim involves the final policymaking authority within a private corporation.

■ However, final policymaking authority can also be conferred on an employee when an official with such authority delegates it to the employee. *See Pemb-*

---

**13.** Even the dozen or so controlled deliveries may fall short of being frequent enough to constitute a moral certainty for Airborne. The example given by the majority in *City of Canton* provides a good measure of the level of a moral certainty—there is simply no doubt

that officers in even the smallest police department will have to arrest fleeing felons. Still, it would have been a closer case regarding moral certainty had the Airborne employees here been involved in a controlled delivery.

*aur,* 475 U.S. at 483, 106 S.Ct. at 1300 (plurality opinion). A municipality or corporation will often grant employees discretion in the performance of their jobs. However, "[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability." *Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 926 (plurality opinion); *see also Jeffes,* 208 F.3d at 57 ("It does not suffice for these purposes that the official has been granted discretion in the performance of his duty."). Accordingly, courts have emphasized that the employee must have "the authority to make *final* policy." *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926 (plurality opinion) (emphasis in original); *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300 (plurality opinion) (municipalities liable only where a choice is made "by the official or officials responsible for establishing final policy with respect to the subject matter in question").

In *Praprotnik,* the Supreme Court described several ways in which the acts of an employee with some degree of delegated discretion could lead to liability for a municipality. "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926 (plurality opinion) (emphasis in original).

■ Plaintiffs' argument ultimately rests on these pronouncements. In effect, they contend that Bezmen and Gennarelli were delegated discretion as to cooperating with law enforcement officials on controlled deliveries, and that there was no Airborne policy that constrained them in this area and no supervision or review of their actions by an Airborne official with final policymaking authority. Therefore, plaintiffs claim, Bezmen and Gennarelli were the final policymaking authority in this area for Airborne, and, accordingly, Airborne is liable for their actions.

Specifically, plaintiffs rely heavily on an Eleventh Circuit case, *Mandel v. Doe,* 888 F.2d 783 (11th Cir.1989). In *Mandel,* a county in Florida had a Memorandum of Understanding with its health department to provide medical care at the county's "road prison." *See id.* at 785. Under this agreement, a physician's assistant was to be located at the road prison at all times to provide medical care. "Although it was originally contemplated that the physician's assistant would be supervised by medical doctor, a custom and practice developed that [the physician's assistant] Hatfield was subject to no supervision or review at all." *Id.* Mandel was an inmate at the road prison for three and a half months. One day, he injured his leg jumping off the bed of a truck. Despite his obvious pain and difficulty walking, Hatfield refused Mandel's initial request for an X-ray and did not treat him at all. Subsequently, Mandel's leg collapsed. Hatfield again examined Mandel, and, despite Mandel's request for an X-ray or to be sent to the hospital, only prescribed Motrin. After Mandel again complained several days later, Hatfield ordered that he be placed in an isolated six by eight foot cell with no sink or toilet. At the next examination, Hatfield again refused Mandel's request to be sent to the hospital. To avoid being sent back to solitary confine-

ment, Mandel said he could return to work. However, the next day, Hatfield sent Mandel back to the isolated cell. A week later, Mandel was released from solitary confinement and was allowed to serve out his remaining month on light work duty. His leg was not examined until after he was released.

In deciding whether the county was liable for Hatfield's clearly unconstitutional actions, the court first noted that under *Praprotnik*, "the mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority." *Id.* at 792. Rather, it concluded that "the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." *Id.* (citing *Praprotnik*, 485 U.S. at 125–28, 108 S.Ct. at 925–26 (plurality opinion)). The court in *Mandel* then held that the county had delegated its final policymaking authority over medical care at the road prison to its health department. *See id.* at 794 & n. 18. Even though the Memorandum of Understanding contemplated that Hatfield would be supervised by a medical doctor, "the evidence revealed that a custom and practice developed" so that "Hatfield was authorized to function without any supervision or review at all." *Id.* at 794. Accordingly, the court held that Hatfield was "the sole and final policymaker with respect to medical affairs at the road prison." *Id.*

Defendants first argue that Bezmen and Gennarelli did not have final policymaking authority because there was an Airborne policy that constrained them—the policy that barred Airborne employees from en-

gaging in illegal activity and falsifying or creating inaccurate or misleading documents. Thus, Airborne in effect argues that any acts of Bezmen or Gennarelli that violated the Mejias' constitutional rights cannot be attributed to Airborne. Plaintiffs respond that there was no relevant policy to constrain Bezmen and Gennarelli, pointing to statements of Bezmen, Gennarelli, and McGorty that the "policy" for controlled deliveries was simply to cooperate fully with law enforcement authorities.[14]

Airborne's policy again is too general to shield it from liability. Airborne did not have a policy that addressed controlled pickups, or even interactions with law enforcement officers. Bezmen, Gennarelli, McGorty, or any other Airborne employee would not have felt (and in fact were not) constrained by it in assisting law enforcement officials with a controlled pickup. Accordingly, Airborne cannot claim that it had a policy that was violated in this instance by its employees.

On the other hand, plaintiffs' argument that Bezmen and Gennarelli were not subject to supervision and review—and thus had final policymaking authority—is incorrect. As noted above, in *Praprotnik* the Supreme Court held that when an employee's discretionary decisions are "subject to review" and were approved by authorized policymakers, "their ratification would be chargeable to the municipality because their decision is final." *Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926 (plurality opinion). Similarly, in *Mandel*, the Eleventh Circuit held that "the delegation must be such that the subordinate's discretion-

---

**14.** It should be noted again that plaintiffs focus on their contention that Airborne had no policy in the area of cooperating with law enforcement officials on controlled deliveries. As discussed above, Bezmen and Gennarelli participated in a controlled pickup, not a con-

trolled delivery. However, the distinction is not relevant here. If Bezmen and/or Gennarelli had final policymaking authority in the area of controlled pickups, Airborne could be liable for their activities.

ary decisions are not constrained by official policies and are not subject to review." *Mandel*, 888 F.2d at 792; *see also O'Connor v. Barnes*, 1998 WL 1763959, at *4 (N.D.N.Y. Mar.18, 1998) ("Thus, an official with authority to make decisions in a particular area can be considered a policymaker where there is an absence of either substantive constraints on or meaningful review of the official's choices.").

However, several circuits have noted that when "the right of review is retained" by a supervisor—called "incomplete" delegation—the municipality or corporation is not liable. *See Williams v. Butler*, 863 F.2d 1398, 1402 (8th Cir.1988) (en banc) ("[A]n incomplete delegation of authority— i.e. [where] the right of review is retained—will not result in municipal liability, whereas an absolute delegation of authority may result in liability."); *see also Jantz v. Muci*, 976 F.2d 623, 631 (10th Cir.1992); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1481–82 (3d Cir.1990); *Worsham v. City of Pasadena*, 881 F.2d 1336, 1340–41 (5th Cir.1989).

Here, Bezmen and Gennarelli were subject to review by their superiors at Airborne. It is uncontroverted that McGorty was Bezmen's supervisor. Any reasonable interpretation of a supervisory relationship in a corporate setting would conclude that McGorty (and his superiors) could have overruled Bezmen at any time, and had the power to review his decisions. That is, there is simply no evidence that the decisions of Bezmen, a regional security manager, were unreviewable by his superiors. Similarly, there is no dispute that Gennarelli was a cartage supervisor who reported directly to Bill Savino. It defies logic and common sense to contend that Gennarelli's decisions could not have been overseen or reviewed by Savino or his supervisors.[15]

Plaintiffs make much of McGorty's testimony that he did not actively oversee Bezmen's involvement in controlled deliveries and that he did not review Bezmen's actions in them. In effect, plaintiffs contend that Airborne is liable for the acts of Bezmen and Gennarelli because no higher authority at Airborne did, in fact, supervise or review their actions in the relevant area. That is, plaintiffs argue that the court should consider whether there was *de facto* supervision and review of the actions of Bezmen and Gennarelli, not whether their actions could have been supervised or reviewed by their superiors at Airborne.

In support of this contention, plaintiffs cite *Jeffes*, a Second Circuit case in which a county sheriff violated the constitutional rights of officers at the county jail by retaliating against those who broke a code of silence. *See Jeffes*, 208 F.3d at 51–55. To determine whether the sheriff or other county officials had final policymaking authority, the court first extensively reviewed state law on the authority of sheriffs over their staffs at county jails. *See id.* at 58–60. After concluding that state and county law made the sheriff the final

---

**15.** Furthermore, *Mandel* itself is distinguishable. Unlike the Memorandum of Understanding in *Mandel*, there does not appear to have been any clear delegation of policymaking authority to Bezmen or Gennarelli. Bezmen was one of three investigators subordinate to McGorty, who himself only had authority over Area 1. Gennarelli was a low-level manager, supervising thirty drivers at the Inwood Station. There is no evidence on Airborne's internal policies of delegation, but it is hardly likely that in a large corporation low-level employees such as Bezmen and Gennarelli would be delegated significant policymaking authority. Plaintiffs argue that the absence of evidence on delegation creates a genuine issue of material fact. To the contrary, any assertion by the plaintiffs about Airborne's delegation, without any supporting evidence and in the face of normal corporate practice, cannot serve to create a genuine issue of material fact.

policymaking authority, the court also noted briefly that the sheriff and his subordinates were not supervised "in practice" by other county officials. *See id.* at 60. It is clear that the opinion rests on the formal lines of authority conferred by positive state and county law, and not on the *de facto* practice of the county officials.

Moreover, the plurality in *Praprotnik* explicitly rejected the suggestion, made by Justice Brennan in a concurrence joined by Justices Marshall and Blackmun and echoed by the plaintiffs here, that "the factfinder must determine where such policymaking authority *actually resides.*" *Praprotnik*, 485 U.S. at 143, 108 S.Ct. at 934 (Brennan, J concurring) (emphasis added). To the contrary, the plurality held that "ad hoc searches for officials possessing such *'de facto'* authority would serve primarily to foster needless unpredictability in the application of § 1983" and would be a step toward adopting the doctrine of *respondeat superior. Praprotnik*, 485 U.S. at 131, 108 S.Ct. at 928 (plurality opinion).

Indeed, the plurality in *Praprotnik* held that a municipality is not liable for the acts of its employees when those employees are subject to review by others with final policymaking authority, but that power to review was not, in fact, asserted. In *Praprotnik*, an architect working for the city was first transferred from one agency to another, then was laid off. *Praprotnik*, 485 U.S. at 115–16, 108 S.Ct. at 920 (plurality opinion). The architect's two superiors at the two agencies had the authority to appoint and transfer employees, but the city's Civil Service Commission had the authority to review those decisions. In addition, the Commission had the final authority to interpret and enforce a city charter article that required all appointments and "separation[s]" from employment to be on the sole basis of merit and fitness. The architect had appealed both decisions to the Commission, which refused to consider the first one because the architect had not suffered any loss in pay or grade, and did not address the second one because it was superceded by litigation.

The Eight Circuit held that the architect's two superiors were municipal policymakers because: (1) their decisions were not individually reviewed by higher supervisory officials; and (2) the Commission's review of these decisions was done in a circumscribed manner that gave substantial deference to the architect's superiors. *See id.* at 129, 108 S.Ct. at 927 (plurality opinion). At the Supreme Court, the plurality found "these propositions to be insufficient to support the conclusion that [the two superiors] were authorized to establish employment policy for the city with respect to transfers and layoffs." *Id.* (plurality opinion). Rather, the Court concluded that "[s]imply going along with discretionary decisions made by one's subordinates ... is not a delegation to them of the authority to make policy." *Id.* at 130, 108 S.Ct. at 927 (plurality opinion). Therefore, as long as an employee's actions are "subject to review," he or she cannot have final policymaking authority even if no review or an inadequate review was actually performed.

The plurality added that it would have been "a different matter" if the particular decision by a subordinate was cast in the form of a policy statement, or if a series of decisions by a subordinate official became a custom or usage of which the superior must have been aware, because in those cases "the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." *Id.* at 130, 108 S.Ct. at 928 (plurality opinion). Plaintiffs argue that a custom and practice de-

veloped so that the decisions of Bezmen and Gennarelli as to controlled pickups were not supervised or reviewed by any superior at Airborne. However, there is no evidence that there was a custom of not reviewing the decisions of Bezmen and Gennarelli as to controlled pickups. As discussed above, this situation was the first and only time Bezmen or Gennarelli participated in a controlled pickup. Although there may have been a custom that McGorty did not review their decisions as to controlled deliveries, there could not have been one regarding controlled pickups.

In sum, neither Bezmen nor Gennarelli had final policymaking authority for Airborne in the area of controlled pick-ups. Accordingly, Airborne's motion for summary judgment regarding plaintiffs' § 1983 claim is granted.

### (3)

### State Malicious Prosecution Claims

The Memorandum and Order of October 5, 2000 also granted Airborne leave to renew its motion for summary judgment on plaintiffs' state law malicious prosecution claims for being barred by the applicable statute of limitations. *See Mejia*, 119 F.Supp.2d at 278–79. Airborne did so on October 16, 2001.

■ The statute of limitations on malicious prosecution claims based on state law is one year after the cause of action accrues. *See* N.Y. C.P.L.R. § 215(3). A cause of action for malicious prosecution accrues on the date that the proceeding is terminated in favor of the plaintiff. *See Scomello v. Caronia*, 232 A.D.2d 625, 625, 648 N.Y.S.2d 688, 689 (2d Dep't 1996). Mr. Mejia was acquitted on March 20, 1995, and he did not file his complaint until June 17, 1996, more than one year later. For unknown reasons, Airborne failed to make this argument in its original motion

for summary judgment, but did so in the second one.

Plaintiffs' only counter-argument is that these claims are under § 1983 and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and thus governed by a three-year statute of limitations. This claim is factually incorrect. As stated in plaintiffs' complaint, the malicious prosecution claims in question were alleged pursuant to "the laws of the State of New York," not § 1983 or *Bivens*. Compl. ¶ 27.

In addition, plaintiff's counsel conceded at oral argument that these claims should be dismissed. Accordingly, Airborne's motion for summary judgment on the state law malicious prosecution claims is granted.

### Conclusion

For the aforementioned reasons, Airborne's motion for summary judgment is granted.